# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket 41275

STATE OF IDAHO,

    Plaintiff-Respondent,

v.

JOSHUA MICHAEL MOSES,

    Defendant-Appellant.

_____

)
)
)
)
)
)
)
)
)
)

Boise, February 2014 Term

2014 Opinion No. 60

Filed: June 19, 2014

Stephen W. Kenyon, Clerk

---

Appeal from the District Court of the First Judicial District of the State of Idaho, Kootenai County.  Hon. John T. Mitchell, District Judge.

The judgment of conviction is <u>affirmed</u>.

Sara B. Thomas, State Appellate Public Defender, Boise, for appellant. Sarah E. Tompkins argued.

Hon. Lawrence G. Wasden, Attorney General, Boise, for respondent. Jessica M. Lorello argued

---

J. JONES, Justice

Joshua Michael Moses appeals his conviction for grand theft by extortion. Moses contends the district court erred when it denied his mid-trial request to question a juror after the juror informed the court that he was suffering from anxiety and was unsure if he could continue participating on the jury. Moses also argues that the district court made errors in evidentiary rulings and that the prosecutor engaged in various forms of misconduct during closing argument. The Court of Appeals heard the appeal and vacated the judgment of conviction, remanding the case for a new trial. The State sought, and this Court granted, review.

## I.
## BACKGROUND

On the morning of July 24, 2010, Walter Ward received a telephone call from his brother-in-law, Joshua Branam. During that call, Branam told Ward that he needed $2,500 or he would be killed. A third person got on the phone and told Ward that "it wasn't a joke, it wasn't some Hollywood bullshit, he wasn't messing around, and not to go to the police." In the course of

1

these conversations, Ward was instructed to take the money to a local Wal-Mart parking lot. As directed, Ward took the money to the specified location and was met by the defendant, Joshua Moses. Ward recognized Moses' voice as that of the third person with whom he had spoken during the call. After giving Moses the money, Ward was directed to the entrance of a trailer park and, after a time, Ward saw Branam walking towards him.

Ward then went to the police. Subsequently, the State charged Moses with grand theft by extortion. The jury returned a guilty verdict and Moses appealed. The Court of Appeals vacated Moses' conviction in a 2-1 decision, holding that the district court erred when it refused to permit Moses to inquire of the juror who expressed reservations about his ability to "continue," given the anxiety he was experiencing. This Court granted the State's petition for review.

## II.
## ISSUES ON APPEAL

I.  Did the district court err in failing to permit or conduct inquiry of a juror who advised the court of anxiety issues during the course of the trial?

II.  Did the district court err in allowing the State to introduce statements made by Branam as adoptive admissions by Moses?

III.  Did the district court err in refusing to permit Moses to call a witness to testify about Branam's prior consistent statements?

IV.  Did the prosecutor commit misconduct during closing argument by engaging in any or all of the following: shifting the burden of proof to Moses, arguing facts not in evidence, misstating the evidence, or appealing to the passions and prejudices of the jurors?

V.  Should Moses' conviction be vacated under the cumulative error doctrine?

## III.
## STANDARD OF REVIEW

"In cases that come before this Court on a petition for review of a Court of Appeals decision, this Court gives serious consideration to the views of the Court of Appeals, but directly reviews the decision of the lower court." *State v. Oliver*, 144 Idaho 722, 724, 170 P.3d 387, 389 (2007).

## IV.
## ANALYSIS

### A.  Mid-Trial Juror Inquiry

While waiting for two jurors to report for duty on the second day of Moses' trial, the

2

district court received a note from the bailiff. This note said that Juror 69 had told the bailiff he was "having anxiety issues" and was "not sure" he could "continue." With counsel present, the bailiff and the district court engaged in the following conversation:

> The Court: Why don't we – would it help [Juror 69] if he were just by himself in a different jury room?
>
> Bailiff: I didn't go into that, Judge.
>
> The Court: Why don't you see if that would make him more comfortable while we wait and sort out where our other two jurors are?[1]
>
> Bailiff: Okay.
>
> The Court: And we can certainly have another bailiff check that room. All right. Well, I guess we've got nothing to do for a while.

After a recess, but still out of the presence of the jury, the district court, the bailiff, defense counsel, and the prosecutor had the following conversation:

> The Court: Juror Number 69 . . . has anxiety issues and is having some difficulty with the back and forth and the contentious nature of the proceedings. I asked [the bailiff] to see if [Juror 69] had . . . any suggestions on what might be done to minimize that. Did he come up with anything?
>
> Bailiff: He did not, Judge
>
> The Court: Okay. All right.
>
> . . .
>
> Defense Counsel: Your Honor, . . . I would like to have a little more information on the juror that suffers with the anxiety to make sure that that's not something that is gonna prevent him from listening to every bit of the testimony. My concern is that if he's under an anxiety attack in the courtroom, he may not be hearing the testimony, and I want to – I don't know how to have the Court make sure that his anxiety is not gonna impact his ability to take in the testimony as it comes in.
>
> The Court: What's the State's position, if any?
>
> The State: This juror was passed by myself as well as counsel, and no one delved into these potential issues, probably because we didn't know about them, but he didn't bring them up.[2] He's not said anything to make anyone aware that he can't be fair and impartial in this case. I think to single him out and to question is gonna make a potential problem even worse, and basically we're worrying about something that we don't know if it happened or not, and I don't think we need to

---

[1] The two other jurors were late because of an auto accident, which is irrelevant to this case.

[2] During preliminary voir dire, the district court posed the following question to the panel of prospective jurors: "[d]o you have a physical or mental disability or condition that would prevent you from being a juror for the next three days?" Juror 69 did not respond to indicate that he did.

take a juror out and single him out and start asking him questions.

The Court: All right. Well, I am going to simply announce to the entire panel that if anybody feels at any time that they do need a break, to please bring that to the Court's attention, but otherwise, I'm not going to inquire further of . . . Juror Number 69.

Once the jury was seated, the court "reminded" the jurors that "if for any reason you feel that you need to have a recess, get my attention, get [the bailiff's] attention, and we will immediately recess. Everybody clear on that? All right." The issue was not raised again during trial.

Moses argued in his opening brief on appeal that the district court erred in preventing him from "questioning the juror about the nature, frequency, effects, and extent of the panic attacks he was suffering during the trial." In his reply brief, Moses makes the more general argument that he "has the right to some form of hearing in order to determine the juror's fitness to continue" and asserts that the district court erred by failing "to conduct any further enquiry at all" of Juror 69. Regardless of how the issue is phrased, the district court committed no error.

It should first be noted that Moses' counsel did not request that she be allowed to inquire of the juror. Further, the district court did not prevent counsel from asking for or making any inquiry. Rather, counsel asked for "a little more information" regarding Juror 69 and then said she did not know "how to have the court make sure that his anxiety is not gonna impact his ability to take in the testimony as it comes in." And, there is no indication in the record that the juror was suffering "panic attacks." Nevertheless, we first consider whether Moses had a right to question the juror.

The Idaho Constitution states that "[t]he right of trial by jury shall remain inviolate." ID CONST. art. I, § 7. That a jury be "impartial," as "guaranteed by the Sixth Amendment of the United States Constitution, is made applicable to the individual states through the Fourteenth Amendment." *State v. Brooks*, 103 Idaho 892, 896, 655 P.2d 99, 103 (Ct. App. 1982) (citing *Parker v. Gladden*, 385 U.S. 363, 364 (1966); *State v. Beason*, 95 Idaho 267, 506 P.2d 1340 (1973)). "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors." *Id.* (citing *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)). "The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Irvin*, 366 U.S. at 722. Thus, "the Due Process Clause protects a defendant from jurors who are actually incapable of rendering an impartial verdict, based on the evidence and the law." *Peters v. Kiff*, 407 U.S. 493, 501 (1972). To be capable, a juror must be "mentally competent to afford a

4

hearing." *Jordan v. Com. of Massachusetts*, 225 U.S. 167, 176 (1912).

It follows that "the right of a party to know whether a juror is qualified and competent is a substantial right that cannot, under our law, be denied." *U.S. v. Alexander*, 2 Idaho 386, 392, 17 P. 746, 749 (Idaho Terr. 1888). Voir dire is the process by which the court or parties examine potential or sitting jurors for competence. I.C.R. 24(b). It presents the opportunity to test "the qualifications of the juror" and "to discover the possible existence of a ground for challenge." I.C.R. 24(b). "The right given to challenge for cause carries with it the right to examine for cause, or have the court do so." *Alexander*, 2 Idaho at 392, 17 P. at 749. The requirement of an impartial jury does not end once the jury is empaneled. "If at any time a juror dies or becomes ill, or upon other good cause shown to the court that the juror is found to be unable to perform jury duty . . . the court may order the juror to be discharged . . ." I.C.R. 24(d)(3).

Although voir dire is generally completed at the beginning of a trial, it may later be reopened at the trial court's discretion. *State v. Leavitt*, 116 Idaho 285, 289, 775 P.2d 599, 603 (1989); 47 Am. Jur. 2d Jury § 171 ("The trial court may permit a party to reopen the examination of a prospective juror who had previously been passed by counsel where counsel has a 'good reason . . . .'"). The Idaho Criminal Rules provide that "[c]hallenges for cause may be made . . . not later than the conclusion of all questions propounded to an individual prospective juror, or the prospective jury if questioned as a whole, except that a challenge for cause may be permitted by the court at a later time upon a showing of good cause." I.C.R. 24(b). "Challenges for cause, as provided by law, must be tried by the court." *Id.* Thus, the decision to reopen voir dire and allow a for-cause hearing is left to the discretion of the district court. *Id.*; *U.S. v. Adams*, 305 F.3d 30, 35 (1st Cir. 2002) ("Whether to reopen voir dire and what questions to permit is largely within the discretion of the district court.").

Moses argues that this Court should review the issue of juror competence de novo. Yet, "'[i]t is the trial court and not this Court which is in a position to determine first hand whether a juror can render a fair and impartial verdict." *Quincy v. Joint School Dist. No. 41*, 102 Idaho 764, 768, 640 P.2d 304, 308 (1981). Indeed, "[d]espite its importance, the adequacy of voir dire is not easily subject to appellate review" because an "appellate court [cannot] easily second-guess the conclusions" of a trial judge "who heard and observed" a juror's responses and demeanor during voir dire. *Rosales-Lopez v. U.S.*, 451 U.S. 182, 188 (1981). "No hard-and-fast formula dictates the

necessary depth or breadth of voir dire." *Skilling v. U.S.*, 561 U.S. 358, 362 (2010). "The trial judge's function at this point in the trial is not unlike that of the jurors later on in the trial. Both must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions." *Rosales-Lopez*, 451 U.S. at 188. Thus, the "determination whether a juror can render a fair and impartial verdict is directed to the sound discretion of the trial court and will not be reversed absent a showing of abuse of discretion." *State v. Hauser*, 143 Idaho 603, 609, 150 P.3d 296, 302 (Ct. App. 2006). Similarly, "[w]hen this Court reviews limitations a district court places on jury voir dire, it applies an abuse of discretion standard." *State v. Dunlap*, 155 Idaho 345, 363, 313 P.3d 1, 19 (2013). This discretion, however, is "subject to the essential demands of fairness." *Aldridge v. U.S.*, 283 U.S. 308, 310 (1931). For example, a trial judge abuses his or her "discretion if the scope of voir dire is so limited that it does not create any reasonable assurances that prejudice would be discovered if present." *U.S. v. Gillis*, 942 F.2d 707, 709–10 (10th Cir. 1991).

Even if we construe Moses' counsel's statement as a request to personally inquire of Juror 69, the determination of such a request was within the discretion of the district court. Moses has failed to show how the court abused its discretion. Indeed, Moses' counsel neither attempted to make a showing of good cause why she should be able to make inquiry, nor objected to the court's failure to grant it.

Nor did the district court abuse its discretion by failing to personally question Juror 69. Because "[o]ne of the grave responsibilities inherent in the trial courts is to provide legal and competent jurors for the trial of all cases that may come before it," we review the district court's decision to allow Juror 69 to remain on the panel without a formal inquiry for an abuse of discretion. *Heitman v. Morgan*, 10 Idaho 562, 570, 79 P. 225, 228 (1905) (Stockslager, C.J. dissenting in part and concurring in part); *State v. Bolen*, 143 Idaho 437, 441, 146 P.3d 703, 707 (Ct. App. 2006) (noting that if the trial court had been informed mid-trial of alleged juror misconduct, "it could have, in its discretion, conducted an inquiry of individual jurors to determine whether" the misconduct had actually occurred). Thus, the issue is not the district court's failure to inquire, but the adequacy of the inquiry and chosen course of action.

Upon learning of Juror 69's anxiety, the district court took action. The court first attempted to make the juror more comfortable by moving him to a separate room and instructing the bailiff to

inquire into the juror's needs. After the juror failed to identify what could be done to make him more comfortable, the court impliedly recognized that the decision of whether to allow further inquiry of Juror 69 was within its discretion—it had a discussion with counsel for Moses and the State and considered their positions in determining how to address Juror 69's anxiety. Ultimately, the court kept Juror 69 on the panel without further inquiry, which implies that the district court determined that the juror was competent and further examination was not necessary. *See Andrews v. Collins*, 21 F.3d 612, 628 n. 33 (5th Cir. 1994) (noting that implied in a refusal to excuse for cause is a trial court's finding that a juror is qualified to serve). Then, the court made a statement to the entire venire reminding the jurors that they were welcome to ask for breaks. This would have at least suggested to the jurors that they had the ability to discuss their needs with the court.

While the juror initially stated that he was not sure if he could continue, the juror never asked to be released nor stated that he could not continue, and this information came to the court during a break, which ended up being a rather extended break. The court was uniquely situated to know just how potentially anxiety-producing the contentious nature of the proceedings may have been, could be through the duration of the trial, or were in comparison with other trials. Defense counsel's concern was whether the juror was able to take in all of the evidence. There is nothing that suggests that the juror had not, could not, or would not listen to the testimony. The district court's chosen course of action was to reiterate to the jury as a whole that which had been emphasized during voir dire, that if anyone needed a break, a break would be immediately taken. No objection to this chosen course of action was made by Moses.

It is reasonable to assume that after the trial resumed, the court, defense counsel, and bailiff may have continued to observe Juror 69 for any outward signs of anxiety. Because no further concerns were raised by anyone, including Juror 69, this Court is not in a position to second guess the district court's handling of the matter. For these reasons, we conclude that the district court did not abuse its discretion in dealing with the matter.

### B. Ward's Adoptive Admission Testimony.

Moses claims that the district court "erred when it admitted statements made by Mr. Branam to Mr. Ward during a phone conversation as adoptive admissions attributable to Mr. Moses under I.R.E. 801(d)(2)(B), because the State failed to establish the necessary foundation for admission of such statements under this rule." Prior to trial, the State filed a motion in limine seeking the district court's permission for Ward to testify as to the following:

> Walter Ward answered the phone at 7:00 am on July 24, 2010. The person calling Ward was Joshua Branam, Ward's brother-in-law. Branam told Ward that he was in trouble and he needed $2,500 or he would be killed. After making that statement, another male with a Hispanic accent apparently took the phone from Branam and told Ward that he was not fucking around, this was not Hollywood, that he wanted the money and to meet him at Walmart. The phone was handed back to Branam and a second conversation ensued between Ward and Branam. During this second conversation, Ward could hear the Hispanic male yelling at Branam calling him stupid. Ward has identified the Hispanic voice as that of the Defendant.[3]

Moses contends that the court erred in granting this motion.

In its brief in support of the motion in limine, the State argued that Ward should be permitted to testify as to the statements Branam made to him during that phone call because they constituted admissions attributable to Moses under I.R.E. 801(d)(2)(B). Under I.R.E. 801(c), "[h]earsay is defined as a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *State v. Timmons*, 145 Idaho 279, 285, 178 P.3d 644, 650 (Ct. App. 2007). Idaho Rule of Evidence 801(d) specifies that admissions by a party-opponent are not hearsay statements. Under I.R.E. 801(d)(2)(B), which is nearly identical to Federal Rule of Evidence 801(d)(2)(B), an adoptive admission is "offered against a party" and is "a statement of which the party has manifested an adoption or belief in its truth." I.R.E. 801(d)(2)(B). The Court of Appeals said in *State v. Nguyen* that "[t]he party contending for adoption has the burden of proving adoption was intended." 122 Idaho 151, 156, 832 P.2d 324, 329 (Ct. App. 1992). The court continued:

> When a statement is offered as an adoptive admission, the primary inquiry is whether the statement was such that under the circumstances, an innocent defendant would normally be induced to respond, and whether there are sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement.

*Id.* (quoting *United States v. Carter*, 760 F.2d 1568, 1579 (11th Cir. 1985)). "Before admitting such a statement, the trial court must determine, as a preliminary question, whether these two criteria have been met." *Carter*, 760 F.2d at 1580.

"Preliminary questions concerning the admissibility of evidence are determined by the trial court." *Bahnmiller v. Bahnmiller*, 145 Idaho 517, 521, 181 P.3d 443, 447 (2008); I.R.E. 104(a). "In making its determination," the court "is not bound by the rules of evidence except those with

---

[3] Moses is actually Native American.

8

respect to privileges." I.R.E. 104(a). If "the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or in the court's discretion subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition." I.R.E. 104(b).

The district court ruled that the statements made by Branam to Ward were admissible as adoptive admissions of Moses, based on the assumption that Ward's testimony would lay a proper foundation. The district court explained:

> Here, as I understand it, and I've looked at this a lot more than one time, Branam gets on the phone to Ward and says what he says, hands the phone to somebody who may be the defendant. That all needs to be – the foundation of that needs to be laid, but assuming that Ward can lay that foundation, I don't see why Branam has to testify to lay a foundation. The foundation seems to be laid by the conversation in context. . . . Branam sets the demand out, and all this other person does, whether it's Mr. Moses or somebody else, is build upon that, says we're not F---in' around, and reiterates the need for the $2500 and where to meet and this isn't Hollywood, and implicit in that is that, yes, in fact we'll kill Mr. Ward if you don't get us the $2500 where we want and when, and so I think the foundation's laid. . . . Assuming that that's – that Ward can identify who that other voice was, the foundation's been laid for an adoptive admission, and it will be allowed at trial.

Thus, the district court held that the testimony as to Branam's statements was admissible, subject to the State first laying a foundation through Ward's testimony that he recognized Moses' voice as the voice of the person with whom he spoke on the phone.

Moses contends that the district court erred when, prior to allowing Ward to testify, it failed to make "any finding Mr. Moses was actually present during the phone conversation, that he had heard Mr. Branam's remarks, or that his conduct evinced acquiescence in the statements Mr. Branam had made." Moses also argues that the "sole 'evidence' the State presented was the prosecutor's mere assertion that Mr. Moses was talking to Mr. Ward during the phone conversation." Moses' arguments fail because under I.R.E. 104(b), the district court was permitted to admit Ward's testimony on a foundation to be later laid. Thus, it was sufficient for the State to make an offer of proof explaining that Ward's testimony would show that Moses was present during the phone call. Accordingly, the district court did not abuse its discretion when it conditioned the admission of Branam's hearsay statements on the State's ability to lay a foundation through Ward's testimony as to Moses' voice on the telephone call. That foundation was properly laid through Ward's testimony and we therefore find no error on the part of the district court.

## C.     Exclusion of Prior Consistent Statement Evidence

Moses argues that the district court erred in excluding one of the witnesses offered to bolster Branam's credibility. Throughout trial, Moses sought to show that he was an unwitting participant in a scheme concocted by Branam. In testimony from Moses' preliminary hearing, which was admitted into evidence at trial, Branam said that he, not Moses, had "wanted to get money" from Ward, so he made a plan to tell Ward "a really good story" that he had been kidnapped, "was gonna be hurt," and "needed the money." Branam stated that "Moses went and picked up the package from my brother-in-law, brought it back to me. He didn't know what it was. I opened it up and I had the money."

The State countered with testimony from Ward, who stated that Branam had "said that he had to lie about his testimony. Um, he said that if he had testified against Mr. Moses that he was afraid that when he subsequently did time in prison that, um, he would be killed." The State also presented the testimony of Officer Scott Harmon, who explained that Branam "told me . . . that, uh, Mr. Moses stated that he . . . wanted the money, and . . . at some point in that time [Branam] was taped to a chair, duct taped to a chair, and proceeded to be beaten, and said that [Moses] wanted the money."

In response, Moses sought to introduce the testimony of two surrebuttal witnesses, Christian Beech and Ed Yankey, who would say that Branam had previously made statements consistent with his testimony at Moses' preliminary hearing. Defense counsel explained that Beech "would testify to overhearing a conversation between Branam and Moses" and Yankey would testify to a conversation he had "directly with Branam, and Branam said that he's the one that did this . . . , Josh Moses didn't do this . . . ." Specifically, Yankey would have testified that he was housed with Branam in jail and Branam had told him "that Moses was in jail because of [Branam], and [Moses] shouldn't be in jail because Josh Moses didn't do anything wrong."

The district court expressed reservations about bringing in surrebuttal witnesses to bolster Branam's credibility because "everything Ward testified about was in regard to the December 10th, 2010, preliminary hearing, so proper rebuttal, surrebuttal rather, would be to discredit Ward, not to bolster Branam." Ultimately, the district court decided to allow the testimony of Beech but not Yankey.

> The reason I'm allowing the testimony of Beech is to give the defense the benefit of the doubt as far as my refusing to allow Beech's testimony in the case-in-chief.

When, at least according to my notes, that was argued yesterday or day before, it was – the argument for admissibility was focused on 804(b)(3), statement against interest. I don't recall anything about prior consistent statements. We'd not had the read-in testimony of Branam yet. Maybe that's why the argument wasn't made.

I don't think either person's testimony, Ward or Yankey, is proper rebuttal. It's not addressing something that was raised in the State's rebuttal case, and I'll just leave it at that.

During his testimony, Beech stated that he overheard a conversation between Moses and Branam during his own preliminary hearing. He said that he recalled "Joshua Moses asking Joshua Branam if there had been any such thing as the kidnap happening" and that "Joshua Branam said no." He stated that he "also heard Joshua Moses ask Joshua Branam if he received the money from him. Joshua Branam said that, yes, I had given you the money." Beech testified that "[i]t was a normal tone conversation" and that both Moses and Branam seemed "relaxed." Beech also stated that he was an acquaintance of both Moses and Branam, and was scared of neither man.

Moses argues that the district court erred in excluding Yankey as a witness because "the testimony of both witnesses was relevant and admissible pursuant to I.R.E. 801(d)(1)(B)." We review a district court's decision to admit or exclude evidence under a hearsay exception for abuse of discretion. *State v. Moore*, 131 Idaho 814, 822, 965 P.2d 174, 182 (1998). The district court erred in concluding that rebuttal evidence is limited to that which impeaches the witnesses presented by the opposing party, rather than that which is responsive to the evidence presented by the opposing party.

Rebuttal evidence is evidence "which explains, repels, counteracts, or disproves evidence which has been introduced by or on behalf of the adverse party." *State v. Butcher,* 137 Idaho 125, 133, 44 P.3d 1180, 1188 (Ct. App. 2002); *State v. Floyd,* 125 Idaho 651, 655, 873 P.2d 905, 909 (Ct. App. 1994); *State v. Sorrell,* 116 Idaho 966, 968, 783 P.2d 305, 307 (Ct. App. 1989). "The mere fact that testimony might well have been presented during [a party's] case in chief does not, by itself, make it inadmissible for rebuttal." *State v. Rosencrantz,* 110 Idaho 124, 129, 714 P.2d 93, 98 (Ct. App. 1986). Here, the State presented Branam's prior inconsistent statements for the purpose of attacking Branam's credibility. Because Moses' proffered surrebuttal evidence was offered to bolster Branam's credibility, thereby counteracting the State's rebuttal evidence that attacked Branam's credibility, it was within the scope of permissible surrebuttal.

By applying the incorrect legal standard, the district court abused its discretion. Because the district court erred, we must consider whether the error was harmless. "The purpose of a harmless error rule is to block setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the results of the trial." *State v. Garcia*, 100 Idaho 108, 111, 594 P.2d 146, 149 (1979) (internal quotations omitted).

> This Court applies the harmless error test articulated by the Supreme Court of the United States in *Chapman v. California*, 386 U.S. 18 (1967). *State v. Perry*, 150 Idaho 209, 222, 245 P.3d 961, 974 (2010). Under the two-part Chapman test, the defendant must establish the existence of an error, "at which point the State shall have the burden of demonstrating that the error is harmless beyond a reasonable doubt." *Id.* To meet that burden, the State must "prove[ ] 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Id.* at 221, 245 P.3d at 973 (quoting *Chapman*, 386 U.S. at 24).

*State v. Joy*, 155 Idaho 1, 11, 304 P.3d 276, 286 (2013).

The State argues that even if the district court erred in excluding Yankey's testimony, "the error was harmless given the cumulative nature of Yankey's proposed testimony in conjunction with the weight of the state's evidence that Moses was, in fact, involved in the extortion." On the other hand, Moses contends that Yankey's testimony "would not have been merely cumulative of that provided by Mr. Beech, as the circumstances surrounding Mr. Branam's statement to Mr. Yankey had independent and substantial probative value for purposes of rebutting the State's claim of fabrication." The State counters:

> While, as Moses notes, the context in which the statements were made were different in that Moses was physically present for Branam's alleged statements to Beech but was apparently not present when Branam talked to Yankey, Branam was incarcerated on both occasions and his underlying fear was the same—fear of retribution for being a "snitch." Thus, any distinction between Branam's statements to Beech and his statements to Yankey based on context is unpersuasive for purposes of deciding whether the evidence is cumulative."

The essential thrust of Yankey's testimony was cumulative of Beech's testimony and does not appear to be made otherwise by reason of its context. Thus, even though the district court erred in disallowing Yankey's testimony, the error was harmless because Yankey's testimony was merely cumulative.

### D.     Prosecutorial Misconduct

Moses contends that the prosecutor engaged in misconduct during closing argument by (1) improperly shifting the burden of proof, (2) referring to facts not in evidence, (3) misstating the

evidence, and (4) appealing to the passions and prejudices of the jurors. The Court of Appeals has correctly observed that:

> Closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case. *State v. Phillips*, 144 Idaho 82, 86, 156 P.3d 583, 587 (Ct. App. 2007). Its purpose is to enlighten the jury and to help the jurors remember and interpret the evidence. *Id.*; *State v. Reynolds*, 120 Idaho 445, 450, 816 P.2d 1002, 1007 (Ct. App. 1991). "The line separating acceptable from improper advocacy is not easily drawn; there is often a gray zone." *State v. Carson*, 151 Idaho 713, 721, 264 P.3d 54, 62 (2011) (quoting *United States v. Young*, 470 U.S. 1, 7 (1985)).

*State v. Rothwell*, 154 Idaho 125, 133, 294 P. 3d 1137, 1145 (Ct. App. 2013). "Both sides have traditionally been afforded considerable latitude in closing argument to the jury and are entitled to discuss fully, from their respective standpoints the evidence and the inferences to be drawn therefrom." *State v. Sheahan*, 139 Idaho 267, 280, 77 P.3d 956, 969 (2003). "Considerable latitude, however, has its limits, both in matters expressly stated and those implied." *Phillips*, 144 Idaho at 86, 156 P.3d at 587.

> "While our system of criminal justice is adversarial in nature, and the prosecutor is expected to be diligent and leave no stone unturned, he is nevertheless expected and required to be fair." *State v. Field*, 144 Idaho 559, 571, 165 P.3d 273, 285 (2007) (quoting *State v. Estes*, 111 Idaho 423, 427–28, 725 P.2d 128, 132–33 (1986)). However, in reviewing allegations of prosecutorial misconduct the Court must keep in mind the realities of trial. *Id.* A fair trial is not necessarily a perfect trial. *Id.*

*State v. Ellington*, 151 Idaho 53, 62, 253 P.3d 727, 736 (2011).

"Where a prosecutor attempts to secure a verdict on any factor other than the law as set forth in the jury instructions and the evidence admitted during trial, including reasonable inferences that may be drawn from that evidence, this impacts a defendant's Fourteenth Amendment right to a fair trial." *State v. Perry*, 150 Idaho 209, 227, 245 P.3d 961, 979 (2010). Our standard for review of alleged prosecutorial misconduct depends upon whether the defense made an objection.

> When there has been a contemporaneous objection we determine factually if there was prosecutorial misconduct, then we determine whether the error was harmless. . . . When there is no contemporaneous objection a conviction will be reversed for prosecutorial misconduct only if the conduct is sufficiently egregious so as to result in fundamental error.

*Field*, 144 Idaho at 571, 165 P.3d at 285. During trial, Moses objected to the alleged burden shift, but did not object to any of the other alleged grounds of misconduct. Because the standard of

13

review is different for instances of alleged misconduct if the defendant has objected, the alleged burden shift will be reviewed separately.

### 1. The prosecutor did not attempt to shift the burden of proof.

Moses contends that the State improperly attempted to shift the burden of proof from itself to Moses. During closing arguments, the State made the following statements in regards to one of the jury instructions:

> The State: One of the instructions deals with – let me read it to you. It's 13F. You've already had it read to you, but it says, "For the defendant to be guilty of Grand Theft by Extortion, the State must prove the defendant had a particular intent. Evidence was offered that at the time of the alleged offense the defendant was ignorant of, or mistakenly believed certain facts. You should consider such evidence in determining whether the defendant had the required intent. If from all the evidence you have a reasonable doubt as to whether the defendant had such intent, you must find the defendant not guilty."

> If you think about that instruction, it may lead you down the path of what is the evidence that establishes that [Moses] was ignorant of what was really going on? In other words, let's assume for a moment that he's hanging around Mr. Branam who is high on meth all the time, that he happens to be in the same house, possibly got on the phone, possibly didn't but just goes on this errand for Mr. Branam who he just had a fight with a couple days ago, and, uh, picks up this package and doesn't know anything about it?

> Defense: Your Honor, I'm gonna object at this point. The prosecution is shifting the burden to the defense at this point that it's our burden of proof to prove the innocence of our client, not their burden of proof to prove his guilt.

> The Court: That objection's overruled.

> The State: The evidence that the defense is relying on to support that instruction that he was ignorant of what was really happening is the testimony of Mr. Branam. Mr. Branam is not all that credible. Mr. Branam is at least in a position that it's hard to attach any weight to what he says in terms of that testimony because of his drug use, because of his motivations, but that's what the defense is relying on for that and nothing else.

> On the other side you've got a series of events that are particularly instructive in terms of the defendant's intent: By the defendant simply going there, simply approaching Mr. Ward, taking the money, telling them where to go, making those statements about what the money was for, about what had already happened to Mr. Branam about taking a life, and then showing them where Mr. Branam was. Mr. Branam appearing. These things happened, and the fact that he had been roughed up a bit is established.

> All of the elements of this offense have been established by the evidence. He is

14

guilty. Thank you.

Moses contends that "this argument improperly sought to shift the burden" from the prosecution, requiring him "to disprove criminal intent, an element of the charged offense." We are unable to find that the prosecutor's argument constituted misconduct.

This case bears similarities to *State v. Raudebaugh*, 124 Idaho 758, 864 P.2d 596 (1993). In that case, the prosecutor told the jury during closing argument that "to accept the defendant's version as to what happened," the jurors "would have to totally believe" the defendant's testimony and "reject all of the State's evidence." *Id.* at 769, 864 P.2d at 607. Raudebaugh argued that the prosecutor's "statement distorted the reasonable doubt burden of proof by indicating that the jury could not acquit Raudebaugh unless they believed every part of Raudebaugh's testimony." *Id.* The Court did not agree.

> Raudebaugh's argument does not bear scrutiny in light of the actual language used by the prosecutor. The prosecutor's statement was a comment on the credibility of Raudebaugh's testimony in light of evidence produced by the state at trial. The prosecutor did not say that the jury had to believe Raudebaugh in order to acquit him. The prosecutor merely pointed out Raudebaugh's testimony and highlighted the conflict between this testimony and the evidence produced by the state at trial.

*Id.*

Here, as in *Raudebaugh*, the prosecutor was commenting on the credibility of the defendant's evidence. The State did not say that the jurors had to believe Branam to acquit Moses. Instead, it said that Branam was not "all that credible" as a witness because of his "drug use" and "motivations." The State also argued that Branam's testimony was Moses' only evidence in support of his contention that he was ignorant of Branam's true plan and therefore lacked intent. The State then went on to discuss the evidence it had presented that Moses did have intent to commit the crime. The prosecutor did not suggest that the State did not have the burden of proving Moses' guilt. Instead, he suggested that Moses had attempted—and failed—to prove that he was ignorant. Thus, the State did not attempt to improperly shift the burden because it focused on the credibility of the evidence presented by Moses.

### 2. The prosecutor did not refer to facts not in evidence or appeal to the passions and prejudices of the jurors but did misrepresent Branam's immunity agreement.

At trial, Moses did not interpose an objection to the other instances of alleged prosecutorial misconduct that he raises on appeal. In such instances:

(1) the defendant must demonstrate that one or more of the defendant's unwaived constitutional rights were violated; (2) the error must be clear or obvious, without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision; and (3) the defendant must demonstrate that the error affected the defendant's substantial rights, meaning (in most instances) that it must have affected the outcome of the trial proceedings.

*Perry*, 150 Idaho at 226, 245 P.3d at 978. Moses has failed to demonstrate fundamental error with regard to any of the three claims of prosecutorial misconduct to which no objection was made.

### i.   The prosecutor did not refer to facts not in evidence.

Moses argues that the prosecutor "referred to facts never placed in evidence," specifically "the fact that there existed an immunity agreement between Mr. Branam and the State regarding his testimony at the preliminary hearing in Mr. Moses' case." During closing argument, the prosecutor made the following statement to the jury:

> You'll recall from the testimony that was read to you that Mr. Branam . . . can't be prosecuted for what he said in that statement that was read to you. He was given immunity.

Moses subsequently acknowledged that the existence of the immunity agreement was referenced in Branam's testimony at Moses' preliminary hearing. Indeed, when Branam's testimony was read into the record, the following exchange was included:

> The State: By the terms of your immunity agreement here today, you realize you can't be prosecuted for what you've testified to?
>
> Branam: Right.

Thus, the prosecutor did not refer to facts not in evidence when he referred to the immunity agreement because the existence of the agreement was read into the record. Therefore, Moses' argument as to misconduct on this ground fails.

### ii.   The prosecutor misrepresented the terms of Branam's immunity agreement.

Prior to testifying in Moses' preliminary hearing, Branam signed an immunity agreement with Kootenai County. That agreement provided that Branam's testimony at Moses' preliminary hearing would not be used against Branam "in any manner in a criminal case, except that he may nevertheless be prosecuted or subjected to penalty for perjury, false swearing, or contempt committed in testifying at the aforementioned preliminary hearing."

16

As previously mentioned, during Moses' preliminary hearing, Branam and the prosecutor had the following exchange, to which Moses did not object:

> The State: By the terms of your immunity here today, you realize you can't be prosecuted for what you've testified to?
>
> Branam: Right.

During closing argument, the prosecutor explained Mr. Branam's immunity agreement by stating:

> Basically [Branam's immunity] means that whatever he says he can't get in trouble for, so whatever he says might as well benefit himself. What benefits him is staying in [Moses'] good graces.

The actual terms of the immunity agreement were not entered into evidence at trial.

Moses argues that the prosecutor misled the jury as to the terms of Mr. Branam's immunity agreement "by telling the jury Mr. Branam faced absolutely no penalty for anything he might say at the preliminary hearing when, in fact, the immunity agreement set forth numerous potential penalties should Mr. Branam falsely testify." The State contends that the prosecutor was only reiterating Branam's testimony as to his understanding of the immunity agreement. In other words, the prosecutor was not testifying as to what the agreement actually provided, but only stating what Branam thought it provided. From his testimony, it appears that Branam may well have believed that he could not be prosecuted at all for his testimony. However, the prosecutor was aware of the actual terms of the agreement and his argument misstated those terms. He did not qualify his argument by stating he was only reiterating how Branam understood the agreement. The State contends that even if the prosecutor committed error, Moses failed to establish the error was plain or that it affected his substantial rights.

"It is improper to misrepresent or mischaracterize the evidence in closing argument." *Rothwell*, 154 Idaho at 133, 294 P. 3d at 1145. Indeed, the prosecutor "has a duty to avoid misrepresentation of the facts and unnecessarily inflammatory tactics." *State v. Griffiths*, 101 Idaho 163, 166, 610 P.2d 522, 525 (1980) (overruled on other grounds by *State v. LePage*, 102 Idaho 387, 630 P.2d 674 (1981)). Here, the prosecutor fell short of that standard by claiming without qualification that Branam could not "get in trouble" for his testimony at Moses' preliminary hearing. The immunity agreement is clear that Branam could be prosecuted for false testimony; claiming otherwise was a misrepresentation.

17

Despite the prosecutor's misconduct, Moses has failed to show that his substantial rights were affected—that the error affected the outcome of the trial. *Perry*, 150 Idaho at 226, 245 P.3d at 978. Branam was Moses' key witness. Moses argues that, had the jury known of the perjury terms in Branam's immunity agreement, it very likely would have attached different weight to his testimony. Branam, however, was an unreliable witness and his testimony was undermined by far more than the prosecutor's mischaracterization of the immunity agreement. He gave two contradictory accounts of the alleged kidnapping. In one version of his story, Branam used Moses as an unwitting dupe to carry out the plan Branam himself developed and executed to extort money from Ward. In the other version of his story, Branam was victimized by Moses as part of Moses' extortion plan. Branam also testified that in the two weeks leading to July 24, 2010, he had been arrested for "[p]ossession of methamphetamine and possession of paraphernalia, resisting arrest and absconding—or obstructing I believe." Specifically, he "ran from the cops. . . ." because he thought he had a warrant out for his arrest. He claimed that on July 24, he was at a friend's house but could not remember if his friend was named Randy or Tony. He testified that while on the phone with Ward on July 24, he was using methamphetamine. His testimony regarding his methamphetamine use was explicit: he stated that he was "injecting it, smoking it, and eating it." He also stated that he was unsure whether Moses was present when he was on the phone with Ward, but admitted that his lack of clarity may have been because he was high on methamphetamine.

Branam testified that he developed his plan to get money from Ward because his own bank account "was frozen" and he "couldn't get any money out of [his] account." Yet, Branam's mother's testimony contradicted this explanation. She testified that both she and Branam were named on the savings account in which Branam held his money and that he had been able to access the funds in his account in July 2010.

In sum, while Moses argues that "[m]ost of the exculpatory evidence in [his] trial came from Mr. Branam's preliminary hearing testimony that was read into the record," Branam's credibility and reliability were seriously affected by his changing stories and drug usage. On the other hand, Ward's testimony was not subject to such infirmities and provided strong evidence against Moses. Further, as the State points out, "the court instructed the jury that the prosecutor's comments were not evidence and that it must follow all of the court's instructions." We presume

18

that the jury did so. *State v. Carson*, 151 Idaho 713, 718, 264 P.3d 54, 59 (2011). Therefore, any error with regard to the prosecutor's misstatement of the immunity agreement could not have affected the outcome of the trial.

> ### iii. The prosecutor did not appeal to the jurors' passions and prejudices when he told the jurors they could take the transcript of Branam's preliminary hearing testimony and "put it in the garbage."

During closing argument, the prosecutor referred to the transcript of Branam's testimony at Moses' preliminary hearing and told the jurors "[y]ou can take that transcript, and you can put it in the garbage. You don't have to rely on anything that that man said, nor should you." Moses contends that these statements amounted to fundamental error because "the prosecutor used inflammatory language" when referring to Branam's testimony and "used this appeal to the jurors' emotions as a vehicle to seek to induce them to disregard this important evidence at trial."

A prosecutor may argue that evidence is "implausible or lacking credibility" without improperly appealing to emotion. *State v. Phillips*, 144 Idaho at 82, 87, 156 P.3d 583, 588 (Ct. App. 2007). A prosecutor does not commit misconduct by simply commenting on the credibility of "testimony in light of evidence produced by the state at trial." *State v. Raudebaugh*, 124 Idaho 758, 769, 864 P.2d 596, 607 (1993) (holding that a prosecutor did not commit fundamental error by pointing out the defendant's testimony and highlighting "the conflict between this testimony and the evidence produced by the state at trial").

In *State v. Sheahan*, the prosecutor made "comments during closing argument that defense counsel had misled and lied to the jury." 139 Idaho 267, 281, 77 P.3d 956, 970 (2003). There, the Court thought it appeared "that the comments were intended to inflame the minds of jurors and arouse passion or prejudice against the defendant based upon asserted misconduct of defense counsel." *Id.* The Court, however, thought it also appeared that the prosecutor "was analyzing the credibility of defense counsel's evidence and the inferences that defense counsel was making from that evidence." *Id.* Even though the "statements were improper," they did "not rise to the level of a fundamental error warranting reversal." *Id.*

In *State v. Kuhn*, the Court of Appeals determined that a prosecutor engaged in misconduct during closing argument when he attacked the credibility of the defendant by accusing him of perjury and calling him a liar. 139 Idaho 710, 85 P.3d 1109 (Ct. App. 2003). In

that case, the prosecutor first discussed the credibility of various witnesses and then "boldly asserted" that the defendant Kuhn's "story was unbelievable and that he lied during trial." *Id.* at 716, 85 P.3d at 1115. The prosecutor based this argument on inconsistencies between Kuhn's testimony at prior hearings, Kuhn's testimony at trial, and other evidence presented at trial. *Id.* After Kuhn's counsel's response, the prosecutor "again noted the inconsistencies" in Kuhn's testimony, "stated that the inconsistencies were the result of Kuhn's perjury, and referred to Kuhn's past convictions of crimes involving dishonesty." *Id.* The Court of Appeals explained that "the prosecutor permissibly argued that the jury should believe the state's side of the story over Kuhn's because his story was inconsistent when compared with his prior testimony." *Id.* Furthermore, the prosecutor "permissibly argued that the reason there were inconsistencies in Kuhn's testimony was because he had lied under oath and that this was not the first time Kuhn had committed dishonest acts." *Id.* Nonetheless, "the prosecutor crossed the line of propriety when he called Kuhn 'a liar and a thief' and expressly accused him of committing perjury, an independent felony." *Id.*

Despite determining that the prosecutor committed misconduct, the court held that the misconduct did not rise "to the level of a fundamental error warranting reversal." *Id.* The court stated that "although the prosecutor committed misconduct during his closing and rebuttal argument, the evidence showed the various inconsistencies referred to." *Id.* The court also noted that "the intensity of the prosecutor's misconduct in Kuhn's case, calling a witness a liar, is no more egregious than the prosecutor commenting that defense counsel lied, which the Supreme Court held not to be fundamental error in *Sheahan*." *Id.* Because the record supported the prosecutor's statements and the misconduct was not as egregious as that in *Sheahan*, the court concluded "that the comments were not so inflammatory that the jurors were influenced to determine Kuhn's guilt on factors outside the evidence and, thus, the prosecutor's actions did not rise to the level of fundamental error." *Id.*

Here, unlike the prosecutors in *Sheahan* or *Kuhn*, the prosecutor did not directly call the witness a liar nor expressly accuse him of perjury. Instead, the prosecutor's comment went to the strength of Moses' evidence, or more correctly, the lack thereof. As previously discussed, the State presented considerable evidence to call Branam's credibility into question and Branam himself admitted that he was "pretty high during those couple weeks" in July 2010 and that his

20

drug use may have affected his memory. Furthermore, Branam had necessarily either lied in his testimony at Moses' preliminary hearing or in his statements to Ward and the police. Thus, in closing argument, the prosecutor made a legitimate point about the value of Branam's testimony and did not engage in misconduct.

### E.      Cumulative Error

Moses claims that "[i]n this case, there were multiple errors occurring at trial, each one impacting" his "right to a fair trial." He argues that "the aggregate effect of the multiple errors occurring in his trial demonstrate this Court should reverse his conviction."

The doctrine of cumulative error provides that "a series of errors, harmless in and of themselves, may in the aggregate show the absence of a fair trial." *Perry*, 150 Idaho at 230, 245 P.3d at 982 (citations omitted). "The presence of errors, however, does not by itself require the reversal of a conviction, since under due process a defendant is entitled to a fair trial, not an error-free trial." *State v. Moore*, 131 Idaho 814, 823, 965 P.2d 174, 183 (1998) (citing *Bruton v. United States,* 391 U.S. 123, 135 (1968)). "[A] necessary predicate to the application of the doctrine is a finding of more than one error." *Perry*, 150 Idaho at 230, 245 P.3d at 982. "[I]t is well-established that alleged errors at trial, that are not followed by a contemporaneous objection, will not be considered under the cumulative error doctrine unless said errors are found to pass the threshold analysis under our fundamental error doctrine." *Id.*

The Court has identified two errors that occurred at trial—exclusion of Yankey as a witness and the prosecutor's misstatement regarding the terms of the immunity agreement. However, the latter was an instance of prosecutorial misconduct that was not objected to at trial and failed our inquiry for fundamental error. Therefore, that error may not be "properly considered error for purposes of cumulative error review." *Id.* at 231, 245 P.3d at 983. Moses "has failed to demonstrate at least two errors, a necessary predicate to the application of our cumulative error doctrine." *Id.* Therefore, the cumulative error doctrine does not apply to this case.

### IV.
### CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

Chief Justice BURDICK, and Justices EISMANN, W. JONES, and HORTON CONCUR.