2019 UT App 17

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DANIEL JAY FOLSOM,
Appellant.

Opinion
No. 20160739-CA
Filed January 25, 2019

Third District Court, Salt Lake Department
The Honorable Elizabeth A. Hruby-Mills
No. 111909566

David M. Corbett, Attorney for Appellant

Sean D. Reyes and Jeffrey S. Gray, Attorneys
for Appellee

JUDGE JILL M. POHLMAN authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS concurred.

POHLMAN, Judge:

¶1     Daniel Jay Folsom appeals his conviction for murder. He contends that the trial court erred in denying him access to the victim's medical records, in making certain evidentiary decisions, and in refusing his request for an instruction on the lesser included offense of negligent homicide. He also raises alternative claims of ineffective assistance of counsel related to the court's evidentiary decisions. We affirm.

BACKGROUND

¶2     Folsom and his girlfriend (Victim) had a rocky eleven-year romantic relationship, during which time Folsom struggled with alcohol abuse. After one of many fights that

turned physical, Victim died from injuries inflicted by Folsom. The State charged Folsom with murder. Folsom claimed that he acted in self-defense.

*Folsom's Request for Access to Victim's Medical Records*

¶3    Before trial, Folsom moved the court to order subpoenas for the production of Victim's psychiatric and mental health records and requested that the court review those documents in camera. In support, Folsom alleged that Victim had been taking various medications to treat her issues with anger and rage, and that the requested records would "further document the existence of [Victim's] violent attacks and bolster the self defense claim with respect to the reasonable belief as to the violent nature of [Victim] and the danger she posed." Although the trial court initially granted Folsom's motion, it later denied the requested relief after one of Victim's representatives objected. The court concluded that Folsom had "not made a sufficient showing . . . that the requested records are reasonably certain to contain exculpatory evidence favorable to his defense," and the court therefore refused to permit "a fishing expedition." The court also refused to allow for an in camera inspection of the records and denied Folsom's requests to reconsider.

*The State's Case-in-Chief*

¶4    The case proceeded to trial, where Folsom and Victim's next-door neighbor (Neighbor) testified for the State. Neighbor testified that around 11:30 p.m. to 11:45 p.m. on December 15, 2011, he heard a knock on his door. When he opened the door, Neighbor found Victim sitting on his porch dressed only in a jacket and pajama bottoms. Victim said, "I need help," and then said, "Dan." Neighbor asked, "Dan did this?" Victim responded, "Yeah. I need help. . . . He is out of control." Neighbor invited Victim inside his house, and he had to assist her because she was having difficulty standing. Neighbor also noticed that Victim's hair was "wet and matted," and her face was "pink and swollen" and covered in blood. Neighbor perceived that Victim

was in "bad shape" and "in obvious pain," as she "wheez[ed] and groan[ed]" while trying to speak. Victim stated, "I don't know if we should call the police." After Neighbor laid Victim down on the couch, Neighbor's wife entered the room. Neighbor's wife testified Victim was "moaning" and in pain, and though Victim "couldn't speak coherently," Victim did say that "he was out of control." Neighbor called 911.

¶5 The responding paramedic testified that Victim had "some physical, obvious trauma to her face," including a bloody nose and split lip, and that she complained of pain in her left rib cage. When he asked Victim what happened, she said she had been assaulted with fists for "a long time." While transporting Victim to the hospital, the paramedic became concerned that Victim had a head injury. A few days later, Victim died.

¶6 The medical examiner who performed Victim's autopsy testified that he observed "a number of blunt-force injuries" on Victim's body, including her face, scalp, arms, legs, and the backside of her torso.[1] He opined that "[p]retty much all of her injuries appeared recent." Although she had an older bruise on her chest, she had several recent bruises on her back and buttocks. She also had bruises and scrapes on her face, legs, feet, arms, and hands, along with bruises and swelling on the back side of her ear. Victim had two lacerations on the back of her head but had no skull or facial fractures. According to the medical examiner, none of Victim's injuries suggested the use of a weapon or instrument. He was "not aware that anything was wielded against [Victim] or that . . . she ran into anything."

¶7 The medical examiner certified Victim's death as "due to blunt injuries of her head." While most of her surface injuries

---

1. The medical examiner's report was admitted into evidence along with many pictures of Victim's injuries. The report documented in excess of fifty distinct and measurable injuries, many of substantial size.

were "in and of themselves nonlethal," the medical examiner opined that "at some point a blow to the head caused [Victim] to start bleeding in her head, and that's what started the cascade of events that ultimately led to her death." He did not know whether a single impact or many ultimately caused Victim's death, but he stated, "Certainly, she has multiple impacts to her head." He posited that Victim's injuries likely occurred while she was moving. As for the two lacerations at the back of her head, the medical examiner testified that those injuries could be explained as resulting from her falling backward into an object. The medical examiner stated that the scrapes on Victim's knees and elbows could have been caused by crawling over bare ground or "from any number of other things."

¶8     The medical examiner concluded that Victim's manner of death was homicide. In his autopsy report, he opined that Victim "died as a result of blunt force injuries of the head sustained when she was beaten by an assailant." Based on the nature and "extent of the injuries," the medical examiner testified that "this is not something that [Victim] could have done accidentally."

¶9     An officer who was dispatched to respond to Neighbor's 911 call (Officer) testified about his interaction with Folsom that night. After officers knocked on the door to Victim and Folsom's house, Folsom came to the door, "sweating" and with "steam coming off of him." Officer saw cuts on Folsom's forehead and under his eye. Officer observed "multiple spots" of what appeared to be wet blood "all across" the upper chest area of the sweatshirt Folsom was wearing. According to Officer, the amount of blood on the sweatshirt was not consistent with Folsom's own injuries. When Officer asked Folsom about the blood and his injuries, Folsom said that he "had eaten a lot of hamburgers" and that he had gotten sick. Officer also observed that Folsom was intoxicated, had "slurred speech," and had "heavy feet," which caused him to stumble "a little bit."

¶10     The State presented evidence that when investigators searched Folsom and Victim's house, they discovered red-brown stains on the walls, the floor, the staircase railing, and other

items. Loose hair was found near the stains and around the house, including "a large chunk of hair" on the floor in the master bedroom. The bathroom was "disheveled," with the toilet seat chipped, broken, and appearing to have been forcefully removed. Other items in the house were broken or knocked over, including a vase, perfume bottles, and a hair clip with hair still in it. The State also offered evidence confirming the presence of blood on Folsom's sweatshirt as well as on surfaces in the bathroom and hallway. Further, Victim's DNA profile matched samples taken from Folsom's sweatshirt and various bloodstains in the house.

¶11 The State also offered character witnesses. First, the State called Victim's mother (Mother). Without objection from the defense, Mother testified that after Victim visited Folsom around Thanksgiving 2010, Victim had a black eye. When Mother asked Victim what happened, Victim answered, "I made Dan mad." Mother also opined that Victim was not a violent person but that Folsom was.[2]

¶12 Second, one of the couple's longtime friends (Sponsor) testified, acknowledging that he had served as Folsom's ostensible sponsor in a group for recovering drug and alcohol addicts. Sponsor described Folsom and Victim's relationship as "[t]umultuous," with some "periods of fighting," but Sponsor never personally witnessed them fight. At times, Sponsor had helped Folsom get and stay sober "for a little while," though Folsom would "go back to drinking," and Folsom and Victim would "start fighting again."

¶13 According to Sponsor, he received phone calls on a couple of occasions that prompted him to go to Folsom and Victim's house. One of those times, around 2004, Sponsor tried to help Victim leave and go to a women's shelter after a fight. Victim

---

2. Victim's former coworker also testified that Victim was not a violent person.

was "scared," but Sponsor convinced Victim to follow him in her own car to the shelter. Although Victim followed him for a time, she stopped following him and changed course when they came within a few blocks of the shelter.

¶14   Sponsor testified that he last saw Victim around September 2011 when he crossed paths with Victim and Folsom in a store parking lot. During this encounter, Sponsor noticed that Victim had a black eye. Over defense counsel's hearsay objection, Sponsor testified that he asked Victim what had happened, and Victim "said she got [the black eye] playing baseball." Sponsor did not believe Victim's explanation.

*Folsom's Testimony*

¶15   Folsom testified in his defense at trial, offering his recollection of that December night. Folsom testified that when he got home early from work, about 4:30 to 5:00 p.m., Victim was "not saying a whole lot," making Folsom think that she was mad at him. Folsom had several drinks at home before he went over to a friend's (Friend) house for the evening. While there, he had more beer with Friend, and they started doing shots of whiskey until they finished the bottle. Folsom and Friend then visited the liquor store and picked up another bottle of whiskey. After returning to Friend's house, they resumed drinking "shot after shot."

¶16   Folsom did not remember returning to his home that night, but he recalled "feeling kind of startled" and "blocking fists." He remembered Victim hitting him in the head, but he did not know if it was with a fist. In response, Folsom "block[ed] shots," "grabb[ed] her and push[ed] her away," with Victim "going this way and going that way." Folsom tried to restrain her by grabbing her by her hands, shoulders, and midsection.

¶17   Folsom's next memory is of Victim "jumping on top of [him] and punching [him]" while he was lying on the bed. Folsom tried to "pull her off" and was able to wrestle with her, flipping her over so that he was on top. He did not remember

what happened with Victim after that. Folsom testified that he sustained scratches to his face, a bad cut on his nose, and lumps on his forehead that lasted about a week.

¶18    Folsom did not remember his interactions with police that night but only recalled seeing emergency personnel in the direction of Neighbor's house and having his blood drawn. He stated that he loved Victim and never thought about causing her significant physical harm.

¶19    Folsom also testified generally about his relationship with Victim, stating that "when it was good, it was way good," and "[w]hen [it] was bad, it was way bad." According to Folsom, the couple would have "real bad" arguments "almost like clockwork every two weeks," and Victim would "blow up," "throw things" like pots and pans, "break things," and "slap" him. Folsom stated that from 2001 to 2003, when Victim was "really upset," she would "charge [him] with her fists going" and hit him in the chest, while he would threaten to call 911. From 2004 to 2007, the couple's "blowouts got closer together"; Victim was "full of anger" and "would get out of control," and the police were called several times.

¶20    When asked whether he was violent with Victim, Folsom testified about one "altercation" that occurred in 2004, when he tried to leave on his bike and they had "a tug of war" over the bike and a bottle of alcohol, resulting in Victim falling to her knees. From 2006 to 2009, the violence "escalated," especially in 2009 when Victim pulled a knife and shotgun on him—an event that resulted in Folsom obtaining a protective order against Victim until they got back together. And from 2009 through 2011, her violence was even "[w]orse."

¶21    Folsom introduced evidence that, over the course of their relationship, the police were called eleven times, with Folsom making nine of those calls. To explain why he made those calls, Folsom stated, "I was afraid of what she might do because she's lied before and it's gotten me in trouble, bad trouble. . . . I'm also afraid of what she might do to me."

¶22 On cross-examination, the prosecutor asked Folsom what Victim had lied about to police in relation to the 2004 incident involving the bike. Over defense counsel's objection on hearsay grounds, Folsom said, "[Victim] lied about me choking her and threatening to kill her, she lied about that." The prosecutor also questioned Folsom about an incident on Thanksgiving 2009. Folsom admitted that he was arrested that day after he had been drinking and the police had been called to the couple's house. When asked what lies Victim had told about that incident, Folsom responded, "She said that I held her at gun point. . . . I believe she said that I pistol-whipped her. That's not true."

¶23 When asked about the nine times that he had called the police, Folsom testified that around January 2004 Victim had punched him twice in the chest and that she was charged with "domestic violence disorderly conduct." He also described a call he made in July 2002 because Victim punched him, testifying that on that occasion Victim "lied about [him] pushing her." With regard to all the other calls he made, Folsom explained that even though Victim had not done anything violent, he made the calls because of "[e]scalating arguments" with Victim that he believed "were always on the verge of violence," and he would tell the police that he did not "know what [she was] going to do." In responding to those calls, the police explained to him "once or twice" the difference between civil and criminal matters.

¶24 Turning to the night in question, December 15, 2011, the prosecutor asked Folsom, "Based on your testimony, you would agree that the injuries [Victim] sustained that night were inflicted by you?" Folsom answered, "Yes." Folsom stated that he did not remember his intent in inflicting those injuries. He acknowledged that he remembered being punched and trying to block those punches and that his intent in blocking those punches was to defend himself. The prosecutor asked Folsom to confirm that after he returned home from Friend's that night, Folsom "blacked out until [he] came to defending [himself]," to which Folsom responded, "That's correct."

*Other Witnesses for the Defense*

¶25    In his defense, Folsom offered testimony relevant to his alcohol consumption on the night of December 15. He called Friend, who testified that Folsom was with him from about 5:00 or 5:30 p.m. until 10:00 or 10:30 p.m. According to Friend, during that time, Folsom drank five or six beers, and they shared a bottle of whiskey. Folsom also called a forensic toxicologist to testify. The toxicologist testified that using Folsom's blood alcohol content that was measured at 7:04 a.m. on December 16, he calculated that Folsom's blood alcohol content was around .2 or .22 at 11:40 p.m. when the police arrived at Folsom's house on December 15. Because chronic alcoholics like Folsom burn off alcohol at a higher rate, the toxicologist opined that Folsom's blood alcohol content could have been as high as .31 at 11:40 p.m.

¶26    Folsom also presented character witnesses. He called two of Victim's relatives (collectively, Relatives). One of them opined that Victim was a violent person, and the other opined that Victim "carrie[d] a lot of anger and . . . [could] be very violent" but that Folsom is nonviolent.[3] He called two other long-standing acquaintances. The first acquaintance testified that Folsom is not violent but that Victim was "semiviolent." The second acquaintance testified that Folsom is not a violent person and that he had "never seen [Folsom] attempt to hurt anyone." The second acquaintance had never seen Victim attempt to hurt anyone either.

¶27    Finally, the defense presented evidence of Folsom's interview with police on the night in question. When police asked Folsom how he was doing that night, he said, "I'm doing good," and repeatedly denied knowing why he was being interviewed. When police asked Folsom to describe his

---

3. One of the relatives also testified that Victim "bruised very easily."

relationship with Victim, he said that it had been "pretty good lately"; though he referred to problems in the past, he said they had "gotten past all of that" and were "doing good." Folsom stated that he had spent a few hours with Friend that evening, and while he admitted that he had a few beers before going to Friend's house, he denied that he drank more there. Folsom said that when he returned home that night, he thought Victim was asleep upstairs, and he stayed downstairs and watched TV. Folsom explained that the stains on his sweatshirt might have come from walking into a wall in the kitchen. When informed that the ambulance went to Neighbor's house for Victim, Folsom asked if she was "okay" and if she was "alive." Folsom told the police that he did not know what happened, but he also stated, "For all I know, she could have fell down," and, "I didn't touch anybody. I didn't do anything. I know that much."

*The State's Evidence in Rebuttal*

¶28    The State presented rebuttal evidence. It offered a video of Folsom sitting alone in the police station interview room after the interview had ended. Folsom looked down at his hands and said to himself, "I never touched her." After two minutes, he again looked at his hands and repeated, "I never touched her." Then, after another two minutes passed, Folsom said to himself, "I only touched her once."

¶29    Also in rebuttal, the State recalled Officer, who had interviewed Folsom on December 15. Without an objection from the defense on character evidence grounds, Officer testified that he had been dispatched to the couple's home in August 2004. During that assignment, Officer spoke with Victim and noticed several injuries on her body, including "various abrasions," "a chipped tooth," a "broken fingernail," injuries on both arms, a skinned knee or leg, an abrasion on her back, and "redness around her neck area." He testified that the pink coloration he observed "all the way across" Victim's neck was "consistent with strangulation." The State also offered into evidence several photographs of Victim in August 2004 showing the injuries that

Officer described. Defense counsel stipulated to the admission of those photographs.

¶30    The State concluded with a final rebuttal witness, Victim's former spouse (Ex-husband). Ex-husband testified that Victim was never violent during their relationship and that she was "not violent at all." Over defense counsel's objections based on relevance and hearsay grounds, Ex-husband testified that, when he last spoke to Victim in October 2011, he asked her why she kept going back to Folsom, and Victim responded that Folsom "was sorry, he was going to get help, and do whatever it takes."

*Folsom's Proffered Evidence That Was Excluded*

¶31    Folsom attempted to adduce evidence regarding two types of instances when Victim purported to admit to assaulting Folsom. First, Folsom proffered to the court that Relatives would testify that Victim admitted to them that on more than one occasion she beat Folsom with various objects after he had passed out drunk. Second, Folsom proffered that a coworker (Coworker) would testify that Victim had admitted to attacking Folsom and pulling out some of his hair.

¶32    Folsom urged the court to admit the proffered testimony as statements against penal interest pursuant to rule 804(b)(3) of the Utah Rules of Evidence.[4] The court denied Folsom's request.

---

4. Rule 804(b)(3) provides that when the declarant is unavailable, a statement is not excluded as hearsay if the statement is one that "(A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency . . . to expose the declarant to civil or criminal liability" and "(B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that

(continued…)

It reasoned that Victim's statements to Relatives did not have "sufficient reliability" to be admissible under rule 804. As for Victim's statement to Coworker, the court reasoned that, because it did not expose Victim to potential criminal liability, the statement did not qualify as a statement against interest.

*The Jury Instructions and Verdict*

¶33 Folsom asked the court to instruct the jury on an additional lesser included offense of negligent homicide. The court refused to do so. But the court did instruct the jury on two other lesser included offenses: manslaughter and homicide by assault.

¶34 In addition, the court instructed the jury on several variants of murder, stating that it could find Folsom guilty of murder if he (a) "[i]ntentionally or knowingly caused the death of [Victim]"; (b) "[i]ntending to cause serious bodily injury to [Victim], committed an act clearly dangerous to human life that caused [Victim's] death"; or (c) "[a]cting under circumstances evidencing a depraved indifference to human life, knowingly engaged in conduct which created a grave risk of death to [Victim], and thereby caused [Victim's] death." *See generally* Utah Code Ann. § 76-5-203 (LexisNexis 2017) (defining murder and its variants). The court also instructed the jury on the defenses of intoxication and self-defense.

¶35 The jury convicted Folsom of murder.

## ISSUES ON APPEAL

¶36 On appeal, Folsom asserts two categories of error: errors that bear on the evidentiary picture relevant to his claim of

---

(…continued)
tends to expose the declarant to criminal liability." Utah R. Evid. 804(b)(3).

self-defense, and one error regarding the jury instructions on a possible lesser included offense.

¶37   In the first category, Folsom argues that the trial court erred in refusing his request for access to Victim's medical records. Also in this first category, Folsom challenges several evidentiary decisions. He asserts that the trial court erred in excluding, as hearsay, evidence about Victim's alleged prior assaults on him. He also asserts that the court erred in admitting hearsay and character evidence regarding his alleged prior assaults on Victim and, alternatively, that trial counsel rendered constitutionally ineffective assistance in failing to object to that evidence.

¶38   In the second category, Folsom argues that the trial court erred by refusing to instruct the jury on negligent homicide as a lesser included offense of murder.

¶39   To succeed on any of these issues on appeal, Folsom must demonstrate that the claimed errors were harmful, meaning that the errors "affected the outcome of his case." *See State v. Reece*, 2015 UT 45, ¶ 33, 349 P.3d 712. Similarly, to succeed on his alternative ineffective assistance of counsel claims, he must show that he was prejudiced by his trial counsel's alleged deficient performance. *See Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984).


ANALYSIS

I. Claims Related to the Evidentiary Picture

¶40   We first set forth Folsom's evidentiary claims and the specific evidence at issue. We next set forth Folsom's related arguments regarding resulting harm and his burden to demonstrate harm. After assuming that Folsom is correct with respect to his evidentiary claims and briefly describing the law of self-defense, we ultimately conclude that Folsom has not shown that he was harmed by any error. The evidence at issue

was not reasonably likely to alter the jury's decision about whether Folsom was justified in using force intended or likely to cause death or serious bodily injury. We reach this conclusion chiefly because the overwhelming physical evidence and Victim's significant injuries powerfully demonstrate that Folsom used an unreasonable amount of force against Victim under the circumstances and because much of the evidence at issue is cumulative of other evidence, which allowed the jury to sufficiently consider Folsom's theory of the case. We therefore decline to reverse his conviction based on any of his evidentiary claims.

¶41 Folsom raises three kinds of errors that relate to evidence allegedly relevant to his claim of self-defense. First, he asserts that the trial court erred in denying him "access to [Victim's] medical records to assist in his self-defense claim where reliable evidence suggested that [Victim] received psychiatric medications, at least in part, to treat mental illness that resulted in anger and violence." Under this claim of error, he asserts that Victim's medical "records were relevant to an element of his claim that he acted in self-defense—that he woke up to find [Victim] beating him and took steps to prevent further abuse." According to Folsom, Victim's "fits of anger and rage fueled her violent behavior" and when Victim was not medicated, her "mood swings . . . transformed her from a peaceful person into a violent person."

¶42 Second, Folsom asserts that the trial court should have admitted evidence of Victim's statements made to Coworker and Relatives that Victim had previously assaulted Folsom. Specifically, he asserts he should have been able to present Victim's admissions that she had, on more than one occasion, attacked him after he had passed out from intoxication and that another time she had attacked him and pulled out some of his hair. *See supra* ¶ 31.

¶43 Third, Folsom asserts that the court erred in admitting hearsay and character evidence regarding his alleged prior assaults of Victim and, alternatively, that his trial counsel

rendered ineffective assistance in failing to object to that evidence. In particular, Folsom contends that the following evidence ultimately should have been excluded:

- Victim's statement to police, elicited on cross-examination of Folsom, that Folsom had choked and threatened to kill her in 2004, *supra* ¶ 22;

- Officer's rebuttal testimony that he had responded to the 2004 incident and observed various injuries to Victim, including marks on her neck that were consistent with strangulation, *supra* ¶ 29;

- photographs of the alleged injuries to Victim after the 2004 incident, *supra* ¶ 29;

- Victim's statement made to Ex-husband that Folsom was sorry and was getting help, *supra* ¶ 30;

- Mother's testimony that Victim had a black eye around Thanksgiving 2010 and that Victim explained that she had "made Dan mad," *supra* ¶ 11;

- Sponsor's testimony that Folsom and Victim fought more when Folsom drank, *supra* ¶ 12;

- Sponsor's account of coaxing Victim to go to a shelter, *supra* ¶ 13; and

- Sponsor's testimony about seeing Victim with a black eye in 2011, including her explanation that it came from a baseball game and his disbelief in that innocent explanation, *supra* ¶ 14.

¶44 When it comes to the question of harm, most of Folsom's claimed errors and claims of ineffective assistance of counsel relate to his self-defense theory that Victim was the initial

aggressor in the altercation that led to her death. On his first claim of error, he asserts that, had the court granted his request to access Victim's medical records, he would have been able to present evidence proving Victim's state of mind and to "more effectively cross-examine the multiple witnesses who testified that [Victim] had a peaceful, non-violent character." He also would have used the records "to prove . . . that [Victim] was an angry and violent [person] in support of his self-defense claim" and that her "fits of anger and rage fueled her violent behavior." In his view, this evidence "would have carried great weight in resolving credibility issues among the other witnesses" and "would have certainly made it more likely in the minds of the jury that she was the first aggressor."

¶45    On the second and third claims of error, Folsom asserts that the admission of evidence regarding Victim's alleged prior assaults and the exclusion of evidence regarding his alleged prior assaults would have affected the jury's assessment of their characters for peacefulness and violence. With regard to the excluded evidence of Victim's prior assaults of him, he asserts that that evidence went to the "core" of his defense that "he had to defend himself against a physical attack from [Victim] after she attacked him in a compromised, drunken state." Given that Folsom was the only eyewitness to the December 15 incident and the conflicting testimony about Victim's propensity for violence, Folsom argues that character evidence regarding Victim and Folsom "played a large role" in the case, and that the evidence of Victim's prior assaults of him "would have carried great weight in the minds of the jurors."

¶46    With regard to the admitted evidence suggesting that he had previously assaulted Victim, Folsom emphasizes the tendency of that evidence, in contravention of rule 404 of the Utah Rules of Evidence, to prove that he had "acted violently in the past and must have acted in conformity therewith during the fight that led to [Victim's] death." Folsom states that the physical evidence indicated that Victim's injuries were "consistent with mutual combat" and that the fatal injury "could have resulted

from a single impact." Folsom then asserts that "[w]here credibility about who was the initial aggressor played a crucial role in the case, this evidence [about Folsom's alleged prior assaults], with its tendency to very strongly prove that [Folsom] was the first aggressor in the past, cannot be harmless." Folsom concludes that "there is no real possibility that the jurors would not believe [he] acted in conformity with his prior conduct and murdered [Victim] rather than acting in self-defense."

¶47 To succeed on appeal, Folsom must demonstrate that the claimed errors were harmful. *See State v. Reece*, 2015 UT 45, ¶ 33, 349 P.3d 712 ("[T]he defendant generally bears the burden to demonstrate that the error he complains of affected the outcome of his case."); *see also* Utah R. Crim. P. 30(a) ("Any error, defect, irregularity or variance which does not affect the substantial rights of a party shall be disregarded."). "Harmless errors are those that are sufficiently inconsequential so no reasonable likelihood exists that the error affected the outcome of the proceedings." *State v. Courtney*, 2017 UT App 172, ¶ 22, 424 P.3d 198 (quotation simplified). On the other hand, harmful errors are those where "the likelihood of a different outcome [is] sufficiently high to undermine confidence in the verdict." *State v. Knight*, 734 P.2d 913, 920 (Utah 1987). Likewise, to establish prejudice for ineffective assistance of counsel claims, the appellant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *see also State v. Garcia*, 2017 UT 53, ¶ 37, 424 P.3d 171 ("[U]nder *Strickland*, it is the defendant's burden to show that he was prejudiced by his counsel's performance.").

¶48 For purposes of our analysis, we assume, without deciding, that Folsom is correct that the trial court made the alleged evidentiary errors and his trial counsel performed deficiently in not lodging appropriate objections. But we conclude that Folsom has not shown harm, namely, that there is a reasonable likelihood that the trial court's errors and counsel's deficient performance affected the outcome of the case. We reach

this conclusion because the staggering physical evidence shows that Folsom used excessive force under the circumstances and because the challenged evidence is cumulative of other admitted evidence. On the record before us, there is no reasonable likelihood that, in the absence of these assumed errors, the jury would have concluded that the State failed to prove beyond a reasonable doubt that Folsom was not justified in using the amount of force that he used against Victim. While the evidence that Folsom claims was either improperly admitted or improperly excluded or made unavailable would have perhaps changed the jury's assessment of whether Victim or Folsom was the first aggressor, that evidence was not reasonably likely to alter the jury's view of whether Folsom was justified in using force intended or likely to cause death or serious bodily injury.[5]

¶49    We begin with a brief outline of the law of self-defense. "A person is justified in threatening or using force against another when and to the extent that the person reasonably believes that force or a threat of force is necessary to defend the person . . . against another person's imminent use of unlawful

---

5. Folsom briefly seeks to invoke the cumulative error doctrine, asking this court to "consider the cumulative effect of the various errors complained of in this appeal." Under the cumulative error doctrine, an appellate court "will reverse a jury verdict . . . only if the cumulative effect of the several errors undermines [its] confidence that a fair trial was had." *State v. Martinez-Castellanos*, 2018 UT 46, ¶ 39, 428 P.3d 1038 (quotation simplified). In applying this doctrine, the appellate court "should consider all the identified errors, as well as any errors we assume may have occurred." *Id.* ¶ 40 (quotation simplified). The doctrine will not be applied, however, where the errors, even considered collectively, "are found to be so minor as to result in no harm." *Id.* (quotation simplified). Here, we assume a number of errors and have concluded that the claimed errors, even viewed collectively, were "so minor as to result in no harm." *See id.* (quotation simplified).

force." Utah Code Ann. § 76-2-402(1)(a) (LexisNexis Supp. 2018).[6] "A person is justified in using force intended or likely to cause death or serious bodily injury only if the person reasonably believes that force is necessary to prevent death or serious bodily injury to the person . . . as a result of another person's imminent use of unlawful force, or to prevent the commission of a forcible felony." *Id.* § 76-2-402(1)(b); *see also State v. Sherard*, 818 P.2d 554, 561 (Utah Ct. App. 1991) (stating that reasonable in the context of the self-defense statute means "objectively reasonable" (quotation simplified)).

¶50    A person is not justified in using deadly force, however, if the person

> (i) initially provokes the use of force against the person with the intent to use force as an excuse to inflict bodily harm upon the assailant; (ii) is attempting to commit, committing, or fleeing after the commission or attempted commission of a felony . . . ; or (iii) was the aggressor or was engaged in a combat by agreement, unless the person withdraws from the encounter and effectively communicates to the other person his intent to do so and, notwithstanding, the other person continues or threatens to continue the use of unlawful force.

Utah Code Ann. § 76-2-402(2)(a). The Utah Code specifies that in "determining imminence or reasonableness" of force used in self-defense,

> the trier of fact may consider, but is not limited to, any of the following factors: (a) the nature of the danger; (b) the immediacy of the danger; (c) the

---

6. Because recent amendments to this statute are not material to our analysis, we cite the current version.

probability that the unlawful force would result in death or serious bodily injury; (d) the other's prior violent acts or violent propensities; and (e) any patterns of abuse or violence in the parties' relationship.

*Id.* § 76-2-402(5). When a defendant argues self-defense, the State must "disprove the affirmative proposition of self-defense, not just prove guilt, beyond a reasonable doubt." *State v. Garcia*, 2001 UT App 19, ¶ 16, 18 P.3d 1123.

¶51 The evidence that Folsom identifies as problematic or improperly made unavailable has a common thread: it would bear on whether Victim was the first aggressor and on whether Folsom or Victim (or both) were violent by nature. We conclude that under the law of self-defense, even if there had been more evidence that Victim was a violent person or was the first aggressor[7] on December 15, 2011, and even if there was less evidence that Folsom was a violent person, there still is no reasonable likelihood that the jury would have found that the State failed to prove that the magnitude of the force Folsom used

---

7. Even if the jury accepted Folsom's theory that Victim was the first aggressor, the jury would still need to resolve "whether [Folsom's] killing of [Victim] was reasonable and necessary to defend himself against [Victim's] imminent use of unlawful force." *See State v. Knoll*, 712 P.2d 211, 215–16 (Utah 1985) (quotation simplified) (explaining that even where the victim "first used defendant's undrawn knife to commit the first stabbing," the jury "could justifiably conclude beyond a reasonable doubt that the defendant did not commit the homicide in self-defense because defendant's acts went beyond what was reasonably necessary to defend himself"). We conclude that Folsom has not shown that there is a reasonable likelihood that the assumed errors would impact the jury's determination of the reasonableness of the amount of force Folsom used.

against Victim was unjustified. The circumstances of this case eliminate any reasonable likelihood that the jury could view Folsom's use of force as reasonable.

¶52     According to Folsom's testimony, he returned home drunk on December 15, 2011, and was "startled" by Victim hitting him. Folsom "block[ed] shots," and tried to restrain Victim by grabbing her hands, shoulders, and midsection. Then, when Folsom was lying on the bed, Victim jumped on top of him and punched him. He pulled her off and wrestled with her, eventually flipping her over so that he was on top. Folsom conceded that he inflicted the injuries that Victim sustained that night. Though Folsom did not recall his intent in inflicting those injuries, he remembered being punched and trying to block those punches and that his intent in blocking those punches was to defend himself.

¶53     The physical evidence overwhelmingly indicates that the degree of force Folsom used in inflicting Victim's injuries was unreasonable. In the altercation with Victim, Folsom—who was ten inches taller and at least seventy pounds heavier than Victim—sustained only scratches to his face, a bad cut on his nose, and lumps on his forehead. But the amount of force he used, purportedly to defend himself against Victim's punches, caused extreme injuries to Victim, including "a number of blunt-force injuries" to her face, scalp, arms, torso, and legs. *Supra* ¶ 6 & n.1. He also caused blunt force injuries to Victim's head, which ultimately led to her death. Even accepting that Victim attacked Folsom first, considering Folsom's superficial wounds relative to Victim's numerous, serious, and fatal injuries strongly evidences that Folsom responded with a far greater amount of force than was necessary to defend himself in the manner he described.[8]

---

8. In addition to the testimony at trial, the jury had before it pictures of Folsom's injuries and pictures of Victim's injuries.

¶54    Other compelling evidence also contradicts Folsom's position that he responded to Victim's threat with necessary and proportionate force. For example, when taking into account Folsom's considerable size advantage over Victim, Folsom's own trial testimony—that Victim was punching him from above and that he flipped her over so that he was on top—suggests that he was able to restrain her in a relatively short period of time. But when Victim fled to Neighbor's house, her face was swollen and covered in blood, and she told Neighbor that Folsom did it and was "out of control." And when the paramedic was treating her, Victim reported to him that she had been assaulted with fists for "a long time." Thus, Victim's statements strongly indicate that whatever amount of force Folsom used against Victim that night, that force was in excess of the amount necessary to subdue any threat she posed to him. And even assuming Victim was the first aggressor and was a violent person generally, Folsom's description at trial does not support the notion that he was required to act with such aggression to counter Victim's threat. *Cf. State v. Berriel*, 2013 UT 19, ¶ 14, 299 P.3d 1133 (explaining that force is necessary to defend oneself when it is "absolutely required" and that "the necessary requirement [of section 76-2-402] distinguishes wanton violence from force that is crucial to averting an unlawful attack" (quotation simplified)).

¶55    Further, Folsom's own initial explanations of the night undermine his theory at trial that he used reasonable force in self-defense. He did not tell Officer that Victim had attacked him and, in fact, implied that the wet stains on his sweatshirt were ketchup instead of blood. Likewise, Folsom's initial interview with police did not suggest that he had experienced a life-threatening event. Folsom instead stated that his relationship with Victim was "pretty good lately" and that they had "gotten past" their problems. Yet at trial, Folsom characterized their relationship as either "way good" or "way bad" and described Victim's violence against him as worsening during the two years leading up to Victim's death. Folsom asserts that the challenged evidence would have affected the jury's resolution of whether Victim was the first aggressor. But even assuming that Victim

was the first aggressor, Folsom has not persuaded us—given, among other things, the inconsistencies in his accounts—that the challenged evidence would have changed the jury's evaluation of the question of the reasonableness of Folsom's force.

¶56    It is also important that, contrary to Folsom's version of events at trial, the altercation did not appear confined in time or place. The couple's house was disheveled, with numerous items broken and misplaced, and Victim's loose hair, including a "large chunk" of it, was found on the floor. Notably, Victim's blood was stained throughout the house—on the walls, the floor, the staircase railing, and other items. Moreover, Folsom's sweatshirt had Victim's wet blood all across the upper chest area. In light of this physical evidence from the crime scene as well as Victim's extensive injuries, we see no reasonable likelihood that the jury would have concluded that the State failed to disprove that Folsom's force against Victim was "necessary to prevent death or serious bodily injury." *See* Utah Code Ann. § 76-2-402(1)(b).

¶57    Additionally, Folsom's prejudice arguments focus too narrowly on the supposed fatal blow rather than on the overall magnitude of his force against Victim. He suggests that Victim's fatal injury could have been the result of a single impact, like a fall or by hitting her head on a door molding. In support, he explains that Victim had no skull or facial fractures, that no weapon was used, and that Victim's injuries were consistent with mutual combat. Though the medical examiner acknowledged that two lacerations at the back of Victim's head could be explained as the result of falling backward into an object, he also testified that the nature and extent of Victim's injuries were consistent with her having been involved in an altercation and that "this is not something that she could have done accidentally." Rather, he concluded in his autopsy report that Victim "died as a result of blunt force injuries of the head sustained when she was beaten by an assailant."

¶58    Folsom admits that he caused Victim's injuries, but in arguing that the assumed errors prejudiced him, he does not

address the location of those injuries. Extensive backside injuries to her body, arms, hands, and head are less consistent with Folsom's theory that Victim merely fell backward once. Instead, the backside injuries are more consistent with the State's theory that Folsom struck Victim when she faced away from him and when she was curled up protectively on the ground. Considering the medical examiner's testimony as a whole, along with the bloodstains on Folsom's sweatshirt and throughout the house, the jury was not reasonably likely to have concluded that Folsom caused Victim's fatal injury inadvertently or that Victim's fatal injury was the unfortunate consequence of a limited and reasonable use of force.

¶59   Our conclusion holds even if we assume that the jury concluded Victim was a violent person and was the first aggressor that night. As an initial matter, a lot of evidence supporting Folsom's theory was already in the record. Folsom testified that in the past Victim had struck him, thrown things at him, and once pulled a gun on him, and that not only had he called police about her nine different times, but that he had once obtained a protective order against her and that on one occasion Victim was actually charged with domestic violence. In the context of this already admitted evidence of Victim's violent propensity, Folsom sought to introduce additional proffered evidence of Victim's other attacks against him, which included Victim pulling his hair and beating him with various objects. *Supra* ¶¶ 31–32.

¶60   The proffered evidence was mostly cumulative of his testimony regarding Victim's past treatment of him, and the jury already understood from other admitted evidence that Victim and Folsom's relationship was volatile. And, in any event, there is no evidence reasonably supporting the conclusion that the force Victim used against Folsom—punches—on December 15, 2011, threatened Folsom with death or serious bodily injury and that therefore Folsom feared for his life and his use of force

against Victim was necessary to prevent death or serious bodily injury. *See* Utah Code Ann. § 76-2-402(1)(b).[9] In other words, even if the jury had heard additional evidence of Victim's "prior violent acts or violent propensities" and of "patterns of abuse or violence" in Victim and Folsom's relationship, the jury's determination regarding the reasonableness of Folsom's force would not be reasonably likely to have changed. *See id.* § 76-2-402(5)(d), (e).

¶61   In short, the evidence overwhelmingly shows that Folsom's response was not measured and appropriate, regardless of whether the jury concluded Victim had a violent personality or was the first aggressor that night and regardless of whether the jury concluded Folsom used nonlethal force against her in the past. Folsom has not shown that, but for the claimed errors and deficient performance of counsel, the evidentiary picture would have been altered in a meaningful enough way. That is, there is no reasonable likelihood that the jury would have concluded that the State failed to prove beyond a reasonable doubt that Folsom was not justified in using against Victim the amount of force that he used. As a result, we decline to reverse Folsom's conviction based on these alleged evidentiary errors and ineffective assistance of counsel.

---

9. *See also* 2 Wayne R. LaFave, *Substantive Criminal Law* § 10.4(b) (3d ed. 2017) (explaining that "[p]ast violent conduct of the assailant known by the defendant is also relevant in assessing what the defendant reasonably believed was the quantum of risk to him" and that generally "deadly force may only be used against what is reasonably believed to be deadly force"); *id.* ("He may justifiably use deadly force against the other in self-defense, however, only if he reasonably believes that the other is about to inflict unlawful death or serious bodily harm upon him (and also that it is necessary to use deadly force to prevent it)." (quotation simplified)); *id.* § 10.4(f) ("[O]ne may not, in self-defense, use more force than reasonably appears to be necessary to avoid his adversary's threatened harm.").

II. Lesser Included Offense Instruction

¶62 Folsom contends that the trial court erred by refusing to instruct the jury on negligent homicide as a lesser included offense of murder. In so arguing, he maintains that he was "entitled to an instruction on the lesser-included offense of negligent homicide where there [was] a rational basis for a verdict acquitting [him] of the charged offense [of murder] and convicting him of the included offense." Folsom further asserts in his opening brief that the failure to provide the negligent homicide instruction was harmful and thus requests a new trial.

¶63 The State responds that "any error . . . is harmless where the jury was given a lesser-included manslaughter instruction but the jury nevertheless found [Folsom] guilty of murder" and asserts that, in this regard, *State v. Daniels*, 2002 UT 2, 40 P.3d 611, is dispositive of Folsom's claim of error. In his reply brief, Folsom agrees with the State. He states that in *Daniels*, "the Utah Supreme Court . . . ruled that, where a jury has rejected a lesser-included offense, a defendant cannot show harm for a trial court's failure to instruct the jury on a lesser-included offense of the rejected lesser-included offense." *See generally Daniels*, 2002 UT 2, ¶ 28; *State v. Allen*, 839 P.2d 291, 302 (Utah 1992) (concluding that the failure to give a lesser included offense instruction of negligent homicide was harmless because the jury convicted on murder even though it was also instructed on the lesser included offense of manslaughter); *State v. Gotschall*, 782 P.2d 459, 463–64 (Utah 1989) (holding that if a jury is instructed on second degree murder and manslaughter and convicts the defendant of second degree murder, even if the trial court's failure to instruct the jury on negligent homicide was in error, such error is harmless), *abrogated on other grounds by State v. Doporto*, 935 P.2d 484 (Utah 1997).

¶64 In light of this precedent, Folsom requests only that, "in the event that this Court reverses the case for a new trial on other grounds, . . . the order include an instruction that the trial court provide a negligent homicide instruction upon retrial for

the reasons stated in [his] opening brief." Given Folsom's agreement with the State on this point, and because we have determined that Folsom's other claims of error do not warrant reversing this case for a new trial, we need not further address Folsom's argument regarding the jury instructions.

CONCLUSION

¶65    Although Folsom raises a number of claimed errors on appeal, he has not shown that those claimed errors prejudiced him. As a result, we decline to reverse his conviction and therefore affirm.

———————