**2020 UT App 168**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
SHAYNE MIKEL WALL,
Appellant.

Opinion
No. 20180759-CA
Filed December 17, 2020

Third District Court, Salt Lake Department
The Honorable Amber M. Mettler
No. 161901773

Mary C. Corporon, Crystal Lynn Orgill, and Kristen
C. Kiburtz, Attorneys for Appellant

Simarjit S. Gill and Liesel Roscher, Attorneys
for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES JILL M. POHLMAN and RYAN M. HARRIS
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1 Shayne Mikel Wall appeals his conviction for assault stemming from a physical altercation with the partner of his former girlfriend. Arguing that his trial counsel was deficient in various ways both before and after trial, Wall claims that he received ineffective assistance of counsel. Although we express concerns with trial counsel's handling of the case, we affirm.

## BACKGROUND[1]

¶2 While dating a woman (Girlfriend), Wall developed a relationship with her seven-year-old child (Child), which he continued to maintain even after Wall and Girlfriend ended their relationship. Wall made plans with Girlfriend to take Child to a basketball game one evening in January 2016.

¶3 Earlier that day, Girlfriend's then romantic partner (Victim) became upset with Wall when he learned that Wall had grabbed Girlfriend's "private parts." Victim responded by sending Wall a text message: "Hey fuck face (redneck) I heard that you wanna to get your [ass] kick! You touched my gf asshole. Just let me know when and where and do[n't] go crying to your mamma after ok! Just don't cry later pothead."[2]

¶4 Unfortunately, the evening did not end on a positive note. At around 10:00 p.m., Wall returned to Girlfriend's house after the game to drop off Child. Victim was also at Girlfriend's house at this time, waiting outside in his car for Girlfriend as she readied herself for a date with Victim. After Wall dropped Child off at the door, a verbal altercation between Wall and Victim soon escalated into a physical fight. Victim's injuries included extensive abrasions and swelling to his face, which caused him to miss three weeks of work and suffer from ongoing headaches. Wall had some injuries to his knuckles. After investigation, the State came to believe that Wall had been the aggressor and charged him with one count of assault.

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Daniels*, 2002 UT 2, ¶ 2, 40 P.3d 611.

2. Because the complete text does not appear in the record, we quote here from Wall's rule 23B motion and the police report. *See infra* ¶ 12.

¶5 Wall retained an attorney (Counsel). It appears Counsel's diligence in representing Wall was less than exemplary. Counsel failed to respond to the State's discovery request, even after the district court ordered him to provide the requested information. Counsel also failed to appear at several pretrial proceedings. Counsel eventually sent an email to the court explaining that he had been absent because his bar license was "no longer active" and that he had been advised by the Utah State Bar "to talk as little as possible to the court and or clients until this matter" concerning his license was resolved. He stated that he was under the impression that the Utah State Bar would notify "the court explaining that [Counsel] was no longer licensed and that [he] would not be at any of the hearings." Counsel requested that any hearings be continued until his license was reactivated. After Counsel emailed the court but again failed to appear, the district court issued an order "to show cause why [Counsel] should not be held in contempt of court for failure to appear on multiple occasions on this case," and Counsel finally appeared before the court to explain his previous absences. The court withdrew the order to show cause and moved forward with Wall's pretrial proceedings and a jury trial. While the record contains few details about the reinstatement of Counsel's license, it appears that he had been returned to good standing by February 16, 2018, the date of the hearing at which he attempted to explain his previous failures to appear. After the court withdrew the order to show cause, Counsel represented Wall for the remainder of the district court proceedings.

¶6 At trial, Wall, Victim, a neighbor (Witness), and a detective (Detective) testified. Girlfriend, Child, and Girlfriend's father, who were all inside the house at the time of the assault, were not called to testify.

¶7 Wall's defense at trial was that Victim had initiated the attack and that Wall was acting only in self-defense. Wall testified that he and Victim had a contentious relationship, asserting that Victim had appeared at his house "close to ten times" in the past to tell Wall "to stay away." Wall admitted that

Victim had never threatened to harm him during these past encounters and that none of the encounters had escalated to any physical altercation. With regard to the night of the assault, Wall said that he parked his vehicle about ten to fifteen feet behind Victim's vehicle. He testified that as he was walking back to his vehicle after having dropped off Child, he and Victim "started to have a verbal confrontation." Wall claimed that Victim approached him and came within three feet of him with "both hands balled up . . . at his waist." Wall testified,

> I lunged at him, grabbed him by his chest, picked him off the ground and drove him straight to his back. I believe he was unconscious at that point. I grabbed him by his throat and probably held him for a few seconds. I was [lying] over the top of him. I would say it took five seconds before he moved again and at the end of that five seconds he started hitting me in the back of my head from his back.

Wall explained that he then "popped up" off Victim but that Victim "was still trying to hit" him. In response, Wall "grabbed [Victim] by his head and . . . smashed [Victim's] head into the ground twice." Wall testified that Victim "was pretty hurt at that point and [Wall] knew it." Wall explained that when he stood up at this point, Victim "punched" him in his knee. So, Wall "went right back down on top of [Victim]," "grabbed him at his throat," "and punched him three more times." Wall claimed that, even after Victim was unconscious, he still feared for his life, explaining, "I don't know that he don't got a weapon. He's waiting for me in the dark. And he's been nothing but a problem the entire time." After seeing a car drive by, Wall again got off Victim and left in his vehicle. Wall said that he did not have injuries from the altercation other than abrasions to his hands and a sore knee the next day. Finally, Wall denied having a weapon with him.

¶8 Victim testified that he had been dating Girlfriend for about six years and that he was planning on visiting her at her

house on the night of the altercation. Victim admitted that he was "very upset" with Wall for having grabbed Girlfriend's "private parts" earlier that day and that he responded to this behavior by sending the threatening text message to Wall. Victim said that he had visited Wall's residence in the past on three different occasions to clarify the nature of Wall's relationship with Girlfriend but that these prior interactions between Wall and Victim consisted of only verbal disagreements and were never physical.

¶9 Victim further denied that he was lying in wait for Wall outside of Girlfriend's house. Rather, he explained that he chose to wait curbside in his vehicle for Girlfriend for a few minutes after he learned, en route to her house, that Girlfriend was showering. Victim estimated that Wall parked his vehicle down the street about forty-five to fifty feet away from his vehicle. Victim began to exit his vehicle as Wall walked back to his own vehicle after returning Child to Girlfriend. Victim testified that Wall was calling him names as Wall returned to his vehicle, opened the door, and retrieved a "long object" from under the driver seat. Wall then "came running towards [Victim] with the object." Victim testified,

> I didn't even move. I was just kind of right outside my car. . . . [H]e came at me swinging the object. I remember getting hit the first time on the left side of my face and then a couple times in the back of my head. I lost consciousness. I cannot tell you for how long I was unconscious.

Victim then recalled awakening on his back next to his vehicle with Wall on top of him, while Wall proceeded to punch him nine or ten times, choke him, and slam his "head into the ground." Feeling "very dizzy" and "disoriented," Victim recalled seeing some lights in the road and Wall "running to his car." Victim said he sustained injuries to his eyes, face, nose, mouth, neck, and side and back of his head as a result of the attack. He noted that he suffered substantial pain, pressure in his

head, and vision problems after the assault. He was under a neurologist's care because he continued to suffer from headaches after the incident.

¶10 Witness testified that as she was driving home, she saw two people fighting in the road around 10:00 p.m. She recalled seeing Victim lying on his back near his vehicle with Wall to his side. She saw Wall hit Victim "[a]t least three" times, but she did not see Victim throw any punches. She testified that shortly after her arrival, Wall left the scene.

¶11 Detective testified that based on where Victim's vehicle was parked, there was between fifteen and twenty-five feet separating Wall's and Victim's vehicles. Detective stated that blood was found only on the driver side door of Victim's car and on the road by that door. Detective opined that this blood evidence was not consistent with Wall's contention that Victim had charged at him, stating, "[I]f the fight would have happened where . . . Wall said, we would have seen blood or some evidence of that incident happening there. But where we find it, actually, is in front of [Victim's] car." Detective testified that he found no weapon during his investigation. Finally, Detective noted that Wall had no injuries apart from "some light abrasions to his knuckles."

¶12 The jury convicted Wall as charged, and Wall appeals. In connection with his claims of ineffective assistance of counsel, Wall sought a remand for an evidentiary hearing under rule 23B of the Utah Rules of Appellate Procedure to establish additional findings of fact. This court denied the motion. On appeal, Wall seeks reversal and remand for a new trial. In the alternative, Wall renews his request for remand pursuant to rule 23B.

ISSUE AND STANDARD OF REVIEW

¶13 The sole issue on appeal is whether Counsel rendered constitutionally ineffective assistance to Wall. "An ineffective

assistance of counsel claim raised for the first time on appeal presents a question of law." *State v. Reyos*, 2018 UT App 134, ¶ 11, 427 P.3d 1203 (quotation simplified).

ANALYSIS

¶14    Wall argues that Counsel was ineffective in a number of ways and that, as a result, he was deprived of his right to effective assistance of counsel under the Sixth Amendment to the United States Constitution. Wall's primary contentions focus on Counsel's alleged deficiencies in investigating and presenting evidence on the question of who was the initial aggressor of the altercation. Wall also contends that Counsel acted deficiently by not appearing at certain pretrial hearings, not objecting to a self-defense jury instruction, calling Wall to testify at trial, and not focusing on the elements of self-defense in closing argument.

¶15    To succeed on a claim of ineffective assistance, Wall must show (1) that his counsel performed deficiently and (2) that he was prejudiced as a result. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Because failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address [Wall's] claims under either prong." *See Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182.

¶16    To show deficient performance, Wall must overcome the presumption that Counsel's actions fell "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. "The court gives trial counsel wide latitude in making tactical decisions and will not question such decisions unless there is no reasonable basis supporting them." *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162 (quotation simplified). Moreover, "the question of deficient performance is not whether some strategy other than the one that counsel employed looks superior given the actual results of trial. It is whether a reasonable, competent lawyer could have chosen the strategy that was employed in the real-time context of trial." *State v. Nelson*, 2015 UT 62, ¶ 14, 355 P.3d

1031 (quotation simplified). And "even where a court cannot conceive of a sound strategic reason for counsel's challenged conduct, it does not automatically follow that counsel was deficient. . . . [T]he ultimate question is always whether, considering all the circumstances, counsel's acts or omissions were objectively unreasonable." *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350; *see also State v. Ray*, 2020 UT 12, ¶¶ 34–36, 469 P.3d 871.

¶17 "To establish prejudice, [a defendant] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Popp*, 2019 UT App 173, ¶ 29, 453 P.3d 657 (quotation simplified). In assessing whether a defendant has met this standard, we "consider the totality of the evidence before the judge or jury and then ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *State v. Garcia*, 2017 UT 53, ¶ 28, 424 P.3d 171 (quotation simplified).

A.      Ineffectiveness Claims Related to Self-Defense

¶18 Several of Wall's claims on appeal focus on his assertion that Counsel performed deficiently by failing to investigate or present evidence that Victim was the initial aggressor, which was necessary to support Wall's defense that he acted in self-defense. Specifically, Wall first contends that Counsel did not adequately address inconsistencies in certain factual allegations made at trial (e.g., the location of the vehicles, Victim's reason for visiting Girlfriend, the reason Victim exited his vehicle, and the history of conflict between Wall and Victim). Wall next asserts that Counsel was deficient in failing to call Girlfriend, Girlfriend's father, and Child as witnesses at trial. Wall also claims that Counsel failed to produce a witness list or request discovery from the State, which he argues demonstrates "a marked absence of any contemplation, investigation, or intent to

call witnesses." Lastly, Wall claims that Counsel should have sought to introduce the "full content" of Victim's threatening text message, including "the exculpatory part[] of the text," into evidence and that having the text message as an exhibit would have helped convince the jury that Victim started the fight.

¶19 Assuming that Counsel performed deficiently as Wall claims, Counsel's inadequate representation does not give rise to a determination of ineffective assistance counsel, because even if Counsel could have done more to persuade the jury that Victim was the first aggressor, Wall cannot show how he was prejudiced at trial in light of the evidence produced of his disproportionate response to Victim's alleged aggression. This is because the law on self-defense does not allow for disproportionate use of defensive force. Using force "in excess of the amount necessary to subdue any threat" posed by another person is "unjustified" and "unreasonable." *See State v. Folsom*, 2019 UT App 17, ¶¶ 51, 53–54, 438 P.3d 992. Most certainly, "[a] person is justified in threatening or using force against another when and to the extent that the person reasonably believes that force or a threat of force is necessary to defend the person . . . against another person's imminent use of unlawful force." Utah Code Ann. § 76-2-402(1)(a) (LexisNexis Supp. 2012). But "reasonable" in the self-defense context means "objectively reasonable." *State v. Sherard*, 818 P.2d 554, 561 (Utah Ct. App. 1991) (quotation simplified); *accord In re R.J.Z.*, 736 P.2d 235, 236 (Utah 1987); *Folsom*, 2019 UT App 17, ¶ 49; *State v. Duran*, 772 P.2d 982, 985 (Utah Ct. App. 1989). Moreover, the "nature" and "immediacy of the danger" are factors in "determining . . . reasonableness" of defensive force. *See* Utah Code Ann. § 76-2-402(5)(a)–(b).

¶20 "Defensive force is . . . an act of emergency that is temporally and materially confined, with the narrow purpose of warding off the pending threat." *State v. Berriel*, 2013 UT 19, ¶ 14, 299 P.3d 1133 (quotation simplified). While every person has the right to use force in self-defense, "a defendant may use only reasonable force to repel the perceived attack." *Parker v. United*

*States*, 155 A.3d 835, 845 (D.C. 2017) (quotation simplified). It is assault and not self-defense when a defendant fights back with a level of violence that is out of proportion to the provocation. Defensive force thus "must be proportionate to the requirements of the situation. Where a person has used more force than is reasonably necessary to repel an attack, the right of self-defense is extinguished, and the ultimate result is that the intended victim then becomes the perpetrator." *Geralds v. State*, 647 N.E.2d 369, 373 (Ind. Ct. App. 1995) (quotation simplified); *see also People v. Lauderdale*, 2012 IL App (1st) 100939, ¶ 33, 967 N.E.2d 939 ("The contact between the defendant and the victim was not on equal terms and the defendant's response was out of all proportion."). Here, "the question is thus whether [Wall's] use of force [was] a proportionate reaction to the threat that [he] perceived while in the heat of the moment." *See Parker*, 155 A.3d at 846 (quotation simplified).[3]

¶21    "[U]nder the law of self-defense," even if Victim had been the first aggressor here and evidence of the provocation was presented to the jury, "there still is no reasonable likelihood that the jury would have found that the State failed to prove that the magnitude of the force [Wall] used against Victim was unjustified. The circumstances of this case eliminate any reasonable likelihood that the jury could view [Wall's] use of force as reasonable." *See Folsom*, 2019 UT App 17, ¶ 51. Evidence

---

3. We note that the jury was instructed on proportionality as it relates to self-defense:

> The reasonableness of a belief that a person is justified in using force in self-defense is an objective standard and must be determined from the viewpoint of a reasonable person acting under the then-existing circumstances. Further, the force used must be proportional. That is, only to the extent necessary to defend oneself or a third person from the imminent use of unlawful force.

introduced at trial demonstrated that Wall continued to beat Victim even after he was unconscious and that Victim suffered significant injuries from Wall's beating. Wall did not use defensive force in a "confined" way for the "narrow purpose of warding off" the perceived threat. *See Berriel*, 2013 UT 19, ¶ 14 (quotation simplified). Rather, Wall's use of force was retaliatory and out of all proportion with the threat posed by the unconscious Victim. Put another way, it was not "objectively reasonable" for Wall to continue to beat Victim in self-defense after Victim had lost consciousness. *See Sherard*, 818 P.2d at 561 (quotation simplified). The unconscious Victim did not present a danger, let alone an immediate danger, justifying Wall's continued use of defensive force under the facts of this case. *See* Utah Code Ann. § 76-2-402(5)(a)–(b). "Even accepting that Victim attacked [Wall] first, considering [Wall's] superficial wounds relative to Victim's numerous [and] serious . . . injuries strongly evidences that [Wall] responded with a far greater amount of force than was necessary to defend himself in the manner he described." *See Folsom*, 2019 UT App 17, ¶ 53.

¶22    Thus, Wall's claims of ineffective assistance related to the investigation and presentation of evidence that Victim was the initial aggressor fail because the evidence—including Wall's own testimony—showed that the magnitude of force Wall used against Victim was unjustified. Because there was no reasonable likelihood that the jury could have viewed his use of force as reasonable, Wall was not prejudiced, even assuming Counsel performed deficiently.[4]

---

4. Wall also seeks to renew a previously denied rule 23B motion for remand. *See* Utah R. App. P. 23B(a) ("The motion will be available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective."). In his rule 23B motion, Wall argues that Girlfriend's testimony would have contradicted Victim's testimony, thereby calling Victim's

(continued…)

B.      Counsel's Pretrial Actions

¶23      Wall contends that Counsel's pretrial actions amounted to deficient performance. Specifically, Wall points to Counsel not having an active bar license and failing to appear at several pretrial hearings to demonstrate Counsel's ineffectiveness.

¶24      While Counsel's representation during the pretrial stage was hardly commendable, Wall does not explain how he was prejudiced by Counsel's lack of engagement in the early stages of the pretrial process. As an initial matter, Counsel's failure to respond to the State's discovery request prejudiced the State, not Wall. Furthermore, even if Counsel did not have an active license during a portion of the pretrial proceedings, Wall has not shown how that fact either impaired Counsel's representation once his license was reactivated or hampered Counsel's ability to

_____

(…continued)

credibility into question. Specifically, Girlfriend stated that she told Victim to come inside the house on his arrival but that Victim told her he would wait for her outside in his car. In contrast, Victim testified that he was told to wait outside: "[S]he told me she was in the shower. She said give [her] a couple minutes and [she would] be out . . . ." Girlfriend's affidavit also contains a statement that Victim had told her earlier in the day that "he was going to meet [Wall] at [Girlfriend's] house later that evening . . . to 'kick his ass.'" But even if the information Wall alleges in his rule 23B motion is true and Girlfriend had been called as a witness at trial, any evidence challenging Victim's credibility would not have changed the fact that the physical evidence and Wall's own testimony demonstrated that he responded with disproportionate force to Victim's alleged aggression. Accordingly, we deny the renewed motion for remand for the same reasons we reject Wall's ineffective assistance claims regarding evidence of who was the initial aggressor.

develop a defense during the period his license was inactive. *See McCormick v. State*, 2014 UT App 49, ¶ 3, 321 P.3d 1172 (stating that an attorney being investigated by the bar and eventually losing his license, standing alone, "is insufficient to demonstrate ineffective assistance of counsel"). Finally, Wall has not articulated how he was harmed by Counsel's failure to appear at several pretrial hearings such that our confidence in the verdict should be undermined. Accordingly, Wall has not shown that Counsel's pretrial lacunae created a reasonable probability of a different outcome.

C.    Jury Instructions

¶25    Wall asserts that Counsel was also deficient in failing to object to the court's self-defense instructions. Specifically, he asserts that Counsel stipulated to "inaccurate language of the statutory requirements for self-defense [being] included in the State's proposed instruction." The instruction given to the jury stated "that a person is justified in threatening or using force against another *only* when and to the extent that he or she reasonably believes that force is necessary to defend him or herself or a third party against the other person's imminent use of unlawful force." (Emphasis added.) In contrast, the statute provides that "[a] person is justified in threatening or using force against another when and to the extent that the person reasonably believes that force or a threat of force is necessary to defend the person or a third person against another person's imminent use of unlawful force." Utah Code Ann. § 76-2-402(1)(a) (LexisNexis Supp. 2012). Thus, Wall contends that the addition of the word "only" in the jury instruction had "the effect of limiting the protections to [Wall] of the statute and definition of self-defense."

¶26    We are unpersuaded by Wall's argument. Here, the jury instruction constituted a correct statement of the law even with the inclusion of the additional word. The statutory language has one condition for the use of force in self-defense, namely, a reasonable belief that force is necessary to defend oneself or

another individual against the imminent use of unlawful force. *See State v. Berriel*, 2013 UT 19, ¶ 13, 299 P.3d 1133 ("The key terms in section 76-2-402 for purposes of this case are 'imminent' and 'necessary.'"). Likewise, the jury instruction explained the one condition justifying the use of force as self-defense, namely, a reasonable belief that force is necessary to defend oneself or a third party against another person's imminent use of unlawful force. Thus, the addition of "only" to the jury instruction was largely superfluous and had no effect on the singular nature of the condition for the use of force in self-defense. *Cf. State v. Karr*, 2015 UT App 287, ¶ 15, 364 P.3d 49 (expressing doubt that the omission of superfluous words in a jury instruction had an effect on the outcome of a trial). Because the jury instruction in question accurately reflected the law, we conclude that Counsel was not deficient in failing to object to it. *See State v. Vigil*, 2019 UT App 131, ¶ 11, 448 P.3d 738 ("Failure to object to jury instructions that correctly state the law is not deficient performance." (quotation simplified)).

### D.    The Decision to Have Wall Testify

¶27    Wall contends that he was "forced to take the stand in his own defense" because Counsel's errors resulted in there being "no other witnesses available to rebut [Victim's] testimony."

¶28    The Supreme Court has "recognized that the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." *Jones v. Barnes*, 463 U.S. 745, 751 (1983); *see also State v. Brooks*, 833 P.2d 362, 364 (Utah Ct. App. 1992) ("This fundamental right [to testify on one's own behalf] is guaranteed by both the United States Constitution and the Utah Constitution. The defendant retains ultimate authority in deciding whether or not to testify." (quotation simplified)).

¶29    Here, Wall offers no evidence that he was effectively "forced" to testify due to Counsel's failure to call any other

witnesses. We first note that there were no other witnesses to the assault besides Victim, Witness, and Wall. The witnesses that Wall alleges should have been called (namely, Girlfriend, Girlfriend's father, and Child) did not witness the assault itself. Given this circumstance, it seems likely that the decision to have Wall testify was sound trial strategy, one that Wall would readily embrace as being to his benefit. Counsel "may have thought [Wall's] apparently vivid recall would impress the jury." *See State v. Callahan*, 866 P.2d 590, 594 (Utah Ct. App. 1993). Furthermore, Wall was the only person able to offer rebuttal testimony to the testimony offered by the two State witnesses (namely, Victim and Witness). In addition, Victim described Wall as using some sort of object as a weapon during the assault. Counsel may have concluded that the best—and perhaps only—way to refute this allegation was to have Wall tell his story to the jury. *See id.* at 594 n.2 ("In this case, only [the] defendant could testify to his state of mind [during the altercation]. Trial counsel may well have decided that taking the stand was [the] defendant's only chance of an acquittal, given the prosecution's case against him."). Thus, "[C]ounsel's decision to allow [Wall] to freely testify as to his version of the events meets the deferential *Strickland* standard under which the performance of trial counsel is evaluated." *See id.* at 594.

E.      Closing Arguments

¶30    Lastly, Wall contends that Counsel performed deficiently in failing to make sufficient reference to legal standards underlying a claim of self-defense in his closing argument. Specifically, Wall contends that Counsel "failed to make a single reference to the standard, the elements, the jury instructions, the theory of self-defense, or how self-defense impacted the charge" in closing argument.

¶31    "Closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case. Its purpose is to enlighten the jury and to help the jurors remember

and interpret the evidence." *State v. Moses*, 332 P.3d 767, 780 (Idaho 2014) (quotation simplified). And "courts grant considerable freedom during closing arguments for counsel to discuss fully from their standpoints the evidence and the inferences and deductions arising therefrom." *State v. Thompson*, 2014 UT App 14, ¶ 51, 318 P.3d 1221 (quotation simplified). Thus, there is no mechanical formula defining what a closing argument must contain. Rather, closing arguments give counsel "a final opportunity to review with the jury the admitted evidence, discuss what it means, apply the applicable law to that evidence, and argue why the evidence and law compel a favorable verdict." *People v. Green*, 2017 IL App (1st) 152513, ¶ 77, 100 N.E.3d 491. Reviewing the evidence and arguing why it supported Wall's claim of self-defense was exactly what Counsel did here.

¶32     While it is true that Counsel did not specifically invoke the words "self-defense," "proportionality," or "reasonable doubt" in his closing argument, Counsel took steps to see that the jury was adequately exposed to these concepts by alluding to them in his closing. With regard to self-defense, Counsel told the jury, "[U]nless you believe firmly that [Wall] started this fight, then he's not guilty." Counsel also argued in closing that Wall "defended himself" and that he had "a right to defend himself" in response to Victim's aggression as Victim "waited in the dark . . . to make good on his threats." And Counsel addressed reasonable doubt about who instigated the fight by pointing out that Wall and Victim likely moved around during the fight to explain why all the blood evidence was found by Victim's vehicle. In regard to proportionality, the evidence did not leave Counsel much leeway to argue that the beating was proportional, and so Counsel appears to have legitimately tried to focus the jury on the question Wall could win, telling it to assuage its concern that Victim looked like he got "beat up a little too much" by emphasizing who started the fight. In addition, Counsel had already addressed the issue of proportionality in his opening statement when he explained that

Wall did not sustain any injuries to his face because "the person who wins the fight looks like that. They're not supposed to look like the guy that got beat up. They're supposed to look like the guy that didn't get beat up." *See State v. Henfling*, 2020 UT App 129, ¶ 87, 474 P.3d 994 ("Attorneys often use parlance to keep their comments succinct and to avoid detracting from the point they are making, especially during closing argument, a practice permitted under the considerable latitude afforded to counsel during closing argument."), *petition for cert. filed*, Oct. 27, 2020 (No. 20200800).

¶33 Finally, the information that Wall complains was missing from Counsel's closing argument was included in the jury instructions,[5] and Counsel was entitled to rely on the jury's awareness of the instructions rather than articulate every aspect of Wall's defense in closing. Indeed, the jury was specifically instructed, "When the lawyers give their closing arguments, keep in mind that they are advocating their views of the case. . . . If they say anything about the law that conflicts with these instructions, you are to rely on these instructions." "In the absence of any circumstances suggesting otherwise, courts presume that the jury follows such instructions," and we will not fault Counsel for relying on the presumption that the jury would follow the instructions. *See State v. Campos*, 2013 UT App 213, ¶ 62, 309 P.3d 1160 (quotation simplified).

¶34 In sum, because Counsel employed his closing for the purpose of arguing why the evidence supported Wall's claim of self-defense, we conclude that this ineffectiveness claim fails on the first prong of *Strickland*.

---

5. The jury instructions provided the legal definition of the self-defense, listed the conditions for determining whether an act of defensive force was reasonable, and explained that a self-defense claim is unavailable to an aggressor.

CONCLUSION

¶35    Wall's various claims of ineffective assistance fail for the reasons stated. We further deny his request to renew his rule 23B motion for remand.

¶36    Affirmed.

_____